Docket No.:
07- CV-9824 (RWS)

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NICHOLAS SANDS and SANDS & COMPANY, INC.,

Plaintiffs,

-against-

LEONARD BERNSTEIN and JANE HOLMES BERNSTEIN,

Defendants.

---

## MEMORANDUM OF LAW

---

RIVKIN RADLER LLP
Attorneys for Plaintiffs
NICHOLAS SANDS and SANDS &
COMPANY, INC.
926 RexCorp Plaza
Uniondale, New York 11556-0926
(516) 357-3000

Of Counsel:

Barry I. Levy, Esq.
Jack J. Vobis, Jr., Esq.
Max Gershenoff, Esq.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................ii

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF RELEVANT FACTS ..................................................................1

    I.     Relevant Facts Regarding the Electric Chair Painting ...................................1

    II.    Relevant Facts Regarding the Martinson Coffee Painting ............................6

ARGUMENT...............................................................................................................9

    I.     Defendants' Failure To Comply With Local Rule 56.1
          Precludes Summary Judgment .....................................................................9

    II.    Summary Judgment Should Not Be Considered Until
          Depositions Are Conducted .........................................................................11

    III.   The Electric Chair Contract Was Properly Modified,
          and the Question of Novation Therefore is Irrelevant ..................................12

    IV.   Alternatively, There is a Question of Fact with Respect to Whether
          the Parties Intended to Effect a Novation of the Electric Chair Contract......13

    V.    Defendants are Equitably Estopped from Disputing the Validity
          of the Modified Electric Chair Contract and from Demanding
          the Immediate Return of Electric Chair.......................................................15

    VI.   Defendants are Promissorily Estopped from Disputing
          the Validity of the Modified Electric Chair Contract and
          from Demanding the Immediate Return of Electric Chair ...........................17

    VII.  Where a Contract is Silent with Respect to a Time for Performance,
          the Reasonableness of any Implied Performance Term is a
          Fact-Intensive Inquiry that Precludes Summary Judgment...........................18

    VIII. The Martinson Coffee Contract Satisfies the Statute of Frauds ....................20

    IX.   Defendants are Promissorily Estopped from Denying the Validity of the
          Martinson Coffee Contract ..........................................................................22

    X.    Defendants' Request for Leave to Amend its Answer and Add a
          Counterclaim for Conversion Should be Denied as Futile ...........................23

CONCLUSION ...........................................................................................................25

### TABLE OF AUTHORITIES

### CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)........................................................11

Armstrong v. Tucker, 2000 U.S. Dist. LEXIS 2434 (S.D.N.Y. 2000)..............................10

Auto Style Leasing v. Evans, 1995 U.S. Dist. LEXIS 4228 (S.D.N.Y. 1995).................15

In re Balfour MacLaine Int'l Ltd., 85 F.3d 68 (2d Cir. 1996)............................................13

Camrex Contractors (Marine), Ltd. v. Reliance Marine Applicators, Inc., 579 F.
　　Supp. 1420 (E.D.N.Y. 1984) ......................................................................................13

Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43 (2006). ........................24

Cron v. Hargro Fabrics, 91 N.Y.2d 362 (1998)..................................................................21

Cyberchron Corp. v. Calldata Sys. Dev., 47 F.3d 39 (2d Cir. 1995).....................17, 22, 23

Dallas Aero., Inc. v. CIS Air Corp., 352 F.3d 775 (2d Cir. 2003) .....................................12

DePace v. Matsushita Elec. Corp. of Am., 2004 U.S. Dist. LEXIS 13316
　　(E.D.N.Y. 2004) ...........................................................................................................17

Durow v. GMC, 2008 U.S. Dist. LEXIS 31965 (W.D.N.Y. 2008).....................................24

Enzo Biochem v. Johnson & Johnson, 1992 U.S. Dist. LEXIS 15723 (S.D.N.Y.
　　1992)..............................................................................................................................19

Ehrlich v. Hambrecht, 2005 NY Slip Op 50155U (N.Y. Sup. Ct. 2005) ...........................24

Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003) ................................................................24

Falco Construction Corp. v. Summit General Contracting Corp., 760 F. Supp.
　　1004 (E.D.N.Y. 1991) ..................................................................................................19

General Elec. Capital Corp. v. Eva Armadora, S.A., 37 F.3d 41 (2d Cir. 1994) ..............15

Giannullo v. City of N.Y., 322 F.3d 139 (2d Cir. 2003) .........................................9, 10, 11

Gonzalez-Jimenez v. United States, 2000 U.S. Dist. LEXIS 14040 (S.D.N.Y.
　　2000)..............................................................................................................................10

Grancio v. DeVecchio, __ F. Supp. 2d __, 2008 WL 2831898 (E.D.N.Y., July 24, 2008) ...................................................................................................................... 11

Guggenheim Found. V. Lubell, 77 N.Y.2d 311 (1991) ....................................................... 25

Guilbert v. Gardner, 480 F.3d 140 (2d Cir. 2007) ...................................................... 18, 21

Holtz v. Rockefeller & Co., Inc., 258 F.3d 62 (2d Cir. 2001) ............................................. 9

Joe Simon-Whelan et al. v. The Andy Warhol Foundation, Docket No.: 07-cv-6423 (LTS) ................................................................................................................. 2

Kleinman v. Vincent, 1991 WL 2804 (S.D.N.Y. January 8, 1991) .................................... 11

Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706 (2d Cir. 2001) ......... 17

MTV Networks v. Lane, 998 F. Supp. 390 (S.D.N.Y. 1998) ............................................. 10

May Dep't Stores Co. v. International Leasing Corp., 1 F.3d 138 (2d Cir. 1993) .............. 15

McCall v. Leader, 268 A.D.2d 208 (1st Dep't 2000) ........................................................ 24

McNeil v. Aguilos, 831 F. Supp. 1079 (S.D.N.Y. 1993) .................................................... 10

Multi-Juice, S.A. v. Snapple Bev. Corp., 2006 U.S. Dist. LEXIS 66913 (S.D.N.Y. 2006) ...................................................................................................................... 23

North American Leisure Corp. v. A & B Duplicators, Ltd., 468 F.2d 695 (2d Cir. 1972) ...................................................................................................................... 20

Oscar Prods. v. Zacharius, 893 F. Supp. 250 (S.D.N.Y. 1995) ........................................ 12

Paddington Partners v. Bouchard, 34 F.3d 1132 (2d Cir. 1994) ...................................... 11

Reiss, et al. v. County of Rockland, 1985 U.S. Dist. LEXIS 21633, 1985 WL 426 (S.D.N.Y. 1985) ....................................................................................................... 10

Richardson Greenshields Secur., Inc. v. Mui-Hin Lau, 113 F.R.D. 608 (S.D.N.Y. 1986) ...................................................................................................................... 24

Roach v. City of New York, 782 F. Supp. 261 (S.D.N.Y. 1992) ...................................... 10

Rossi v. New York City Police Dep't., 1998 U.S. Dist. LEXIS 1717 (S.D.N.Y. 1998) ...................................................................................................................... 10

Schloss Bros. & Co. v. Bennett, 260 N.Y. 243 (1932) ..................................................... 14

Matter of Shondel J. v. Mark D., 7 N.Y.3d 320, 326 (2006). ..........................................15

Smith Barney, Harris Upham & Co. v. Liechtensteinische Landesbank, 866 F.
Supp. 114 (S.D.N.Y. 1994) .....................................................................................19

Smith v. Planas, 151 F.R.D. 547 (S.D.N.Y. 1993)............................................................24

Sporn v. MCA Records, Inc., 58 N.Y.2d 482 (1983)........................................................25

Thompson v. Gjivoje, 896 F.2d 716 (2d Cir. 1990) ........................................................12

Tocker v. Philip Morris Cos., Inc., 470 F.3d 481 (2d Cir. 2006) ....................................24

Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 736 F. Supp. 1281
(S.D.N.Y. 1990)......................................................................................................14

Travelers Indem. Co. v. Hunter Fan Co., 2002 U.S. Dist. LEXIS 1238 (S.D.N.Y.
2002).........................................................................................................................10

Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737 (2d Cir. 1979)..................20

Watt v. New York Botanical Garden, 2000 U.S. Dist. LEXIS 1611 (S.D.N.Y.
2000).........................................................................................................................10

Weisse v. Engelhard Minerals & Chemicals Corp., 571 F.2d 117 (2d Cir. 1978)............21

Yahaya v. Hua, 1989 U.S. Dist. LEXIS 14115 (S.D.N.Y. 1989)......................................14

Zev v. Merman, 73 N.Y.2d 781 (1988)..............................................................................19

## STATUTES

Fed. R. Civ. P. 7(b)(1) .....................................................................................................23

Fed. R. Civ. P. 56(b)........................................................................................................11

N.Y. Gen. Oblig. Law § 5-1103 ......................................................................................13

N.Y. Gen. Oblig. Law § 5-701 - .....................................................................................20

N.Y. U.C.C. § 2-201 -.......................................................................................................20

## PRELIMINARY STATEMENT

Plaintiffs Nicholas Sands ("Sands") and Sands & Company, Inc. ("S&C") (collectively "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion by Defendants Leonard Bernstein and Jane Holmes Bernstein (collectively "Defendants" or the "Bernsteins") for summary judgment or, in the alternative, for leave to amend their answer. As a threshold matter, Defendants have failed to submit Local Civil Rule 56.1 statement which in and of itself warrants a denial of their motion. Furthermore, the papers that Defendants have elected to submit to support their summary judgment motion raise more fact questions than they answer, and are replete with misstatements of law. As discussed below, summary judgment cannot be granted in this case and the Defendants' motion should be denied.[1]

## STATEMENT OF RELEVANT FACTS[2]

Sands, who has worked for more than 20 years as a fine art dealer, gallery owner, and consultant, is the president and sole owner of S&C, a New York-based fine art business that he incorporated 11 years ago. Through his years of industry experience, Sands has developed a particular expertise in works by the late Andy Warhol ("Warhol").

## I.    Relevant Facts Regarding the Electric Chair Painting.

The Andy Warhol Art Authentication Board (the "Warhol Board") is the only official body recognized by the art world as authorized to certify the authenticity of Andy Warhol ("Warhol") paintings. In recent years, the Warhol Board has come under increasing scrutiny for its secretive, arbitrary practices and for apparent conflicts of interest among its board members.

---

[1]    In addition, Defendants' request for leave to amend their answer is meritless, inasmuch as the proposed claim for conversion would be futile under established law.

[2]    The statement of facts is derived from the accompanying declaration of Nicholas Sands and the documents attached thereto.

Ultimately, on July 13, 2007, these practices and conflicts of interest forced a number of injured art collections to file a class action lawsuit in this Court, which alleges that the Warhol Board and others have engaged in a series of fraudulent and manipulative acts. *See Joe Simon-Whelan et al. v. The Andy Warhol Foundation*, Docket No.: 07-cv-6423 (LTS)(the "Warhol Litigation"). The Warhol Litigation seeks, *inter alia*, an order replacing the Warhol Board as the sole authenticating authority for Warhol works, or to have the Warhol Board's authentication methods amended.

On February 15, 1997, Plaintiffs entered into a contract (the "Electric Chair Contract") with Defendants whereby the Defendants engaged S&C's services in an attempt to have a painting known as "Electric Chair" authenticated as a genuine Warhol work. Under the Electric Chair Contract's initial terms, Defendants agreed that if S&C could secure Electric Chair's authentication during 1997, they would sell the painting to Sands for $65,000.00. After entering into the Electric Chair Contract with Defendants on February 15, 1997, Sands and S&C embarked on an intensive effort to secure the authentication of Electric Chair. By late 1997, however, it became apparent that S&C would require additional time in order to have Electric Chair declared authentic. Accordingly, Sands approached Defendants and sought their consent to extend the time period covered by the Electric Chair Contract through 1998, "or longer if needed". Under the proposed revised contractual terms, if S&C could have Electric Chair authenticated during 1998 – "or longer if needed" – Defendants would agree to sell the painting to Sands for $65,000.00. On December 14, 1997, Defendant Leonard Bernstein ("Mr. Bernstein") signed the modified contract, thereby giving S&C until 1998 – or longer if needed – to secure authentication of Electric Chair.

Despite S&C's initial efforts, the Warhol Board denied Electric Chair's authenticity on at least two occasions since 1997. However, the Warhol Board never provided any reason for rejecting Electric Chair's authenticity, and over the course of the past 10 years the Warhol Board's standards and practices increasingly have been called into question in media reportage and in civil litigation. Since initial authenticity rejections may be overturned through concerted, long-term effort (which Sands knew from industry experience and his own personal involvement with at least 2 examples), Sands and S&C steadfastly persisted in their efforts to have Electric Chair declared a genuine Warhol painting. Defendants repeatedly and consistently approved of Plaintiffs' continued attempts to secure the authentication of Electric Chair. For example, after signing the modified Electric Chair Contract – which provided Plaintiffs with as much time as needed to secure Electric Chair's authentication – Defendants expressed support for Plaintiffs' ongoing efforts in the following manner:

(i)     on September 13, 2001, Mr. Bernstein wrote to Sands and expressed approval after Sands met with individuals in the New York Attorney General's office regarding structural problems within the Warhol Board's authentication process;

(ii)    on November 5, 2003, Mr. Bernstein wrote to Sands and expressed interest in creating a rival authenticating body to challenge the Warhol Board's authentication monopoly;

(iii)   on November 15, 2003, Sands wrote to Mr. Bernstein and advised him of Plaintiffs' continuing efforts to authenticate Electric Chair, including consideration of lawsuits, government intervention, establishment of a new authenticating body, and meetings with similarly-situated individuals. Sands specifically noted that this work – by its very nature – would require long-term effort. On November 16, 2003, Mr. Bernstein wrote back to Sands, and suggested the establishment of an industry-funded organization charged solely with the authentication of works of art, which could rival the Warhol Board;

(iv)    on November 16, 2003, Sands wrote to Mr. Bernstein and – among other things – advised him that Plaintiffs had approached the International Foundation for Art Research and the conservation laboratory at the Guggenheim Museum in the hope of securing their assistance in authenticating Electric Chair. On November 17,

3

2003, Mr. Bernstein responded with additional suggestions regarding the establishment of an entity that could rival the Warhol Board;

(v)     on June 3, 2004, Mr. Bernstein wrote to Sands and asked whether there were any developments regarding Electric Chair's authentication. Sands responded on June 8, 2004 by advising Mr. Bernstein that he planned to visit London within the next few weeks for a meeting regarding the painting. On June 24, 2004, Sands advised Mr. Bernstein that he had conducted a meeting in London regarding Electric Chair's authentication, and participated in a conference call with a journalist regarding the Warhol Board's practices. Mr. Bernstein wrote back to Sands on June 24, 2004, and expressed support regarding S&C's continued efforts;

(vi)    on February 13, 2005, the Bernsteins paid Sands a visit, where they discussed S&C's ongoing efforts to secure Electric Chair's authentication. Afterwards, on February 14, 2005, Mr. Bernstein wrote Sands to express his hope that all of S&C's work would pay off;

(vii)   on about May 20, 2005, Sands wrote to Mr. Bernstein and advised him of another art authentication project that Plaintiffs successfully completed, and expressed his hope that Plaintiffs would be able to achieve a similar result with Electric Chair. On May 20, 2005, Mr. Bernstein wrote back to Sands and also expressed the hope that Plaintiffs would be able to secure Electric Chair's authentication through their ongoing efforts;

(viii)  in about November 2005, Mr. Bernstein expressed an interest in retrieving Electric Chair from S&C so that he and his wife might temporarily enjoy the work, but allowed that Plaintiffs would continue working on its authentication under the terms set forth in the Electric Chair Contract. On November 24, 2005, Sands wrote to Mr. Bernstein, memorialized their discussion, expressed his willingness to return the painting, and reiterated his intention to continue working on the project pursuant to the Electric Chair Contract. On November 25, 2005, Mr. Bernstein wrote back to Sands and expressed continued support for Plaintiffs' efforts, noted that once Sands returned Electric Chair to him Sands could have it back whenever he needed it for authentication purposes. Mr. Bernstein suggested that he would pick up the painting in April-May 2006, when he would be in New York; and

(ix)    Though Mr. Bernstein did come to New York during the spring of 2006, he never retrieved Electric Chair, nor did he make any attempt to retrieve the painting. In fact, Bernstein told Sands during this visit that S&C could "just keep the painting" as it was of "no use" to him.

As noted above, on July 13, 2007 a class action lawsuit was commenced in this Court,

seeking – among other things – either to replace the Warhol Board as the sole authenticating

4

authority for Warhol works, or to amend the Warhol Board's authentication methods. On July 17, 2007 – only four days after the lawsuit was filed and the news media published major stories concerning the litigation – Defendants' attorney sent a letter to S&C demanding the immediate return of Electric Chair.

S&C actively continues to seek Electric Chair's authentication up through today. Indeed, since 1997 it has engaged in sustained and continuous efforts toward that end. S&C has expended considerable time, effort, and money in these efforts over the past ten (10) or more years and the Bernsteins have been kept apprised of these on an ongoing basis. The Bernsteins have never contributed towards the ultimate goal of securing the authentication of the work nor has S&C ever requested any form of reimbursement because the time, labor and expense were built in to the agreed purchase price that was established when the agreement with the Bernsteins was reached.[3]

The Bernsteins are well aware of the fact that S&C cannot secure Electric Chair's authentication without having the actual painting in its possession. From the ongoing media coverage associated with the litigation, the Bernsteins also are aware that the pending federal class action lawsuit against the Warhol Board is likely to effect changes in the Warhol Board's review process that would favor Electric Chair's prospects for authentication. Indeed, the sole reason that the Bernsteins have demanded Electric Chair's immediate return is to destroy S&C's ability to have the painting authenticated, and thereby prevent S&C from reaping the benefit of its bargain – i.e., the right to purchase Electric Chair for $65,000.00, according to the terms of the Electric Chair Agreement.

---

[3]     In other cases where S&C has been requested to perform similar functions without it being tied to a right to purchase the work, it would generally bill the client for all of Sands' time and the actual costs which can amount to tens of thousands of dollars depending upon the level of effort and expenditure necessary to achieve the ultimate result.

## II.    Relevant Facts Regarding the Martinson Coffee Painting.

On May 24, 2006, Mr. Bernstein wrote to Sands and recounted discussions with Sotheby's and the Boston Museum of Fine Arts (the "MFA") regarding a possible sale of a Warhol painting known as "Martinson Coffee," which Defendants owned.[4]  Specifically, Mr. Bernstein indicated that Sotheby's evinced a willingness to list Martinson Coffee for $2-3 million, and that he had engaged in discussions with the MFA regarding a possible gift annuity transfer.  Sands responded to Mr. Bernstein on May 25, 2006, in an effort to convince him to permit S&C to sell Martinson Coffee privately.

On June 21, 2006, Mr. Bernstein wrote Sands to say that he did not think that the MFA would be able to purchase Martinson Coffee, and that the MFA's inability to purchase the painting left Sotheby's and Plaintiffs as the two prospective seller's agents. Mr. Bernstein added, however, that unless Plaintiffs could produce "something concrete," he would sell Martinson at auction through Sotheby's. On July 12, 2006, Mr. Bernstein wrote to Plaintiffs to reiterate his intent to sell Martinson Coffee through Sotheby's unless Plaintiffs could produce "anything concrete" within the next few days. (Id. at ¶ 18; see also Exhibit "O").

After receiving Mr. Bernstein's July 12, 2006 correspondence, Sands spoke with him by telephone. During this conversation, Sands advised Mr. Bernstein that he thought Plaintiffs could sell Martinson Coffee for approximately $5 million, representing – less Plaintiffs' 10 percent commission ($500,000.00) – a net profit of $4.5 million for Defendants. Mr. Bernstein agreed to hold Martinson Coffee exclusively for Plaintiffs so that S&C could offer it to clients at the $5

---

[4]    Sands had knowledge of Defendants' ownership of Martinson Coffee since 1996 when he originally contacted Mr. Bernstein to inquire about whether he was interested in offering the work to him after having learned that he owned that work of art. Mr. Bernstein indicated at the time that while he did not have any present interest in selling the work that he would let Sands know if circumstances changed.

million price, so long as the Bernsteins received $4.5 million net.  Mr. Bernstein also agreed to ship Martinson Coffee to Plaintiffs if S&C needed to present the painting to clients.  Based upon Mr. Bernstein's representations, Plaintiffs began to contact their clients and offer Martinson Coffee for sale.  Plaintiffs never would have contacted their clients regarding Martinson Coffee if Mr. Bernstein had not represented his willingness to ship the painting to Plaintiffs for inspection by prospective buyers.[5]  Between July 18, 2006 and July 23, 2006, Sands wrote to Mr. Bernstein several times to apprise him of Plaintiffs' clients' interest in Martinson Coffee, and to ask him to ship Martinson Coffee to S&C so that Plaintiffs' clients could view the painting.  On July 23, 2006, Sands advised Mr. Bernstein that a prospective buyer had expressed strong interest in Martinson Coffee, but the buyer's agent demanded to see it in order to be certain that Plaintiffs could produce the painting for sale.

On July 24, 2006, Mr. Bernstein wrote Sands to say that Defendants had decided to sell Martinson Coffee through Sotheby's, despite their agreement to hold the painting exclusively for sale through S&C at the $4.5 million net price.  In that same correspondence, Defendants offered to modify their agreement with Plaintiffs.  Specifically, instead of offering Martinson Coffee through S&C, the Bernsteins agreed to pay Sands an agent's fee based upon the painting's final sale price at auction through Sotheby's.  Sands spoke with Mr. Bernstein by telephone shortly after receiving his correspondence, and Mr. Bernstein said that Defendants would pay Sands five (5) percent of the sale price at the upcoming Sotheby's auction. Essentially, the Bernsteins promised that if Plaintiffs would forego the 10 percent commission that they stood to earn in a

---

[5]    Fine art dealers live by their reputations, and it is extremely damaging to a dealer's reputation if he represents that he has a painting of this magnitude to sell, then cannot produce the painting when a client asks to view it.  No potential purchaser would make an offer on a work of art of this magnitude (especially a $5,000,000 offer) without an actual viewing.   This is customary in the trade

private sale, and abandon their claims regarding Defendants' failure to offer Martinson Coffee exclusively for sale through S&C and to produce Martinson Coffee for inspection by Plaintiffs' prospective buyers, then they would pay Sands a five percent agent's fee on the proceeds of the upcoming auction at Sotheby's.

Though Plaintiffs were not obligation to abandon their rights under their initial agreement with Defendants, they reluctantly agreed to do so in consideration for Defendants' agreement to pay Sands a five percent agent's fee on the Sotheby's auction sale price. (the "Martinson Coffee Contract"). Plaintiffs accepted Defendants' offer even though Defendants' behavior had caused damage to Plaintiffs' professional reputation because Sands had gone out on a limb to contact clients and represent that S&C was the exclusive dealer for Martinson Coffee. Nonetheless, Sands hoped to maintain his relationship with Defendants, based on their longstanding friendship.

Between July 2006 and November 14, 2006 – the date of the Sotheby's auction – Sands repeatedly spoke and corresponded with the Bernsteins, offering them his advice on the auction at their request. On about November 14, 2006, Martinson Coffee sold at auction for $3.4 million, to an unidentified buyer. Sands suspected that the ultimate buyer was one of the clients to whom Plaintiffs had offered the painting in July 2006, at the Bernsteins' request. However, Mr. Bernstein would not confirm Sands' suspicion.

Though Defendants had agreed to pay Sands a five percent agent's fee on the Sotheby's auction sale price, which amounted to $170,000.00, they never sent Sands his check. Accordingly, on January 7, 2007, Sands wrote to Defendants and raised the issue. On January 8, 2007, Sands once again wrote to Defendants and specifically asked when they intended to send him the five percent agent's fee under the Martinson Coffee Contract. In response, on January 9,

2007 Mr. Bernstein wrote to say that Defendants "have not made any decisions on any of this."

Sands once again demanded payment on January 9, 2007. In response, on January 12, 2007 Mr.

Bernstein announced the Bernsteins' intention to breach the Martinson Coffee Contract.

## **ARGUMENT**

### I.    **Defendants' Failure to Comply with Local Rule 56.1 Precludes Summary Judgment**

Local Civil Rule 56.1 ("Rule 56.1") of the United States District Court for the Southern

District of New York explicitly requires all motions for summary judgment to be accompanied

by a statement of material facts ("Rule 56.1 Statement"). See Giannullo v. City of N.Y., 322 F.3d

139, 140 (2d Cir. 2003); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir. 2001). Rule

56.1 equally is clear with respect to the sanctions available for failure to attach a Rule 56.1

Statement to a summary judgment motion:

> (a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of
> Civil Procedure, there shall be annexed to the notice of motion a separate, short and
> concise statement, in numbered paragraphs, of the material facts as to which the moving
> party contends there is no genuine issue to be tried. Failure to submit such a statement
> may constitute grounds for denial of the motion. Local Civ. R. 56.1(a).
>
> ...
>
> (d) Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including
> each statement controverting any statement of material fact, must be followed by citation
> to evidence which would be admissible, set forth as required by Federal Rule of Civil
> Procedure 56(e).

Defendants' summary judgment motion is plainly in violation of Local Civil Rule 56.1,

inasmuch as no statement of undisputed material facts has been filed.[6] While a district court has

discretion whether to overlook a party's failure to comply with local court rules, Holtz, 258 F.3d

---

[6]    The only place where facts are recited are within that portion of the Defendants'
memorandum of law entitled "Background" (*See* Defendants' Memorandum of Law ("Def.
Memo") at p. 4). Virtually all of the statements in that section of the memorandum are disputed.

at 73, such latitude generally is reserved for <u>pro se</u> litigants. <u>See</u> <u>Armstrong v. Tucker</u>, 2000 U.S. Dist. LEXIS 2434 (S.D.N.Y. 2000); <u>citing</u> <u>McNeil v. Aguilos</u>, 831 F. Supp. 1079, 1086 (S.D.N.Y. 1993); <u>Roach v. City of New York</u>, 782 F. Supp. 261, 266 (S.D.N.Y. 1992); <u>Gonzalez-Jimenez v. United States</u>, 2000 U.S. Dist. LEXIS 14040, *11-12 (S.D.N.Y. 2000). Accordingly, failure to comply with the requirements of Local Civil Rule 56.1 constitutes grounds for denial of a motion for summary judgment where – as here – the moving party is represented by counsel. <u>Rossi v. New York City Police Dep't.</u>, 1998 U.S. Dist. LEXIS 1717 at *4 (S.D.N.Y. 1998) (denying plaintiff's motion for summary judgment for failure to comply with Rule 56.1 by not annexing a short and concise statement of material facts); <u>see also</u> <u>MTV Networks v. Lane</u>, 998 F. Supp. 390, 393 (S.D.N.Y. 1998); <u>Reiss, et al. v. County of Rockland</u>, 1985 U.S. Dist. LEXIS 21633, 1985 WL 426, at *1 (S.D.N.Y. 1985) (denying summary judgment where movant submitted no statement at all); <u>see also</u> <u>Travelers Indem. Co. v. Hunter Fan Co.</u>, 2002 U.S. Dist. LEXIS 1238 (S.D.N.Y. 2002).

Additionally, Defendants do not, by and large, cite to any evidence that would be admissible in support of their "Background" statements, as required by subsection (d) of Rule 56.1. Defendants' abject failure to comply with subsection (d) provides a further basis for denial of Defendants' summary judgment motion. <u>See</u> <u>Giannullo v. City of N.Y.</u>, 322 F.3d at 143 (finding that there was insufficient evidence in the record to support certain critical assertions in the moving party's statement of material facts, and thus reversing the district court's grant of summary judgment); <u>Watt v. New York Botanical Garden</u>, 2000 U.S. Dist. LEXIS 1611 at *1 (S.D.N.Y. 2000) (holding "where there are no [] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion").

Consequently, "[w]here the movant fail[s] to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." Giannullo, 322 F.3d at 140-41 (internal quotations and citations omitted).[7]  Accordingly, Defendants' failure to provide the statement required by Local Civil Rule 56.1(a) is fatal to its motion for summary judgment, and the Court should deny the motion.

## II.    Summary Judgment Should Not Be Considered Until Depositions Are Conducted

The Defendants' motion in this case was filed shortly before the party depositions were scheduled to be held in this matter, and were cancelled by Defendants thereafter.  On that basis alone, the motion should be denied until such time as the Bernsteins submit to a deposition. Although a party may move for summary judgment "at any time" (see Fed. R. Civ. P. 56(b)), pre-discovery summary judgment is the exception rather than the rule and will be granted "only in the clearest of cases." See Kleinman v. Vincent, 1991 WL 2804 at *1 (S.D.N.Y., January 8, 1991); Moore's Federal Practice, ¶ 56.15[5] at 56-308 n. 28 (1993 & Supp.1994). Under Rule 56(f), a pre-discovery summary judgment on a properly supported record may nonetheless be inappropriate where the party opposing it shows that due to inadequate discovery it cannot "present facts essential to justify [his] opposition" that could be uncovered by additional discovery. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n. 5 (1986); see also Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994); Grancio v. DeVecchio, --

---

[7]    Not to be overlooked is the prejudice suffered by Plaintiffs based upon Defendants' failure to file a Rule 56.1 Statement. Plaintiffs are handicapped in formulating a response to Defendants' motion for summary judgment, as Defendants' omission makes it impossible for Plaintiffs to respond in compliance with Local Civil Rule 56.1(b).

11

F.Supp.2d ----, 2008 WL 2831898 (E.D.N.Y., July 24, 2008). For the reasons discussed in the accompanying declaration of Barry I. Levy, Esq., summary judgment should be deferred pending depositions of the Bernsteins.[8]

### III.    The Electric Chair Contract was Properly Modified, and the Question of Novation Therefore is Irrelevant

Defendants' contention that the December 14, 1997 amendment to the February 15, 1997 Electric Chair Contract does not fulfill the requirements for novation is inapposite and, therefore, irrelevant. (See Def. Memo at ¶ 25). In fact, the December 14, 1997 agreement simply modified the Electric Chair Contract, and the requirements for novation have no bearing on the enforceability of the agreement. In effect, Defendants' entire "novation" argument is a red herring meant to distract from the fact that the Electric Chair Contract is valid as modified and enforceable under settled New York law.  Unlike a novation, the modification of a contract results in the establishment of a new agreement between the parties which pro tanto supplants the affected provisions of the original agreement while leaving the balance of it intact. Thompson v. Gjivoje, 896 F.2d 716, 722 (2d Cir. 1990) (internal quotations and citations omitted). The proponent of a contract modification must demonstrate each element requisite to the formulation of a contract, including mutual assent to its terms. Dallas Aero., Inc. v. CIS Air Corp., 352 F.3d 775, 783 (2d Cir. 2003). Under New York law, the general requisites for formation of a contract – and by extension for modification of a contract – include offer, acceptance, and consideration. Oscar Prods. v. Zacharius, 893 F. Supp. 250, 255 (S.D.N.Y. 1995). However, these common law

---

[8]    Rule 56(f) requires the Court to consider (1) whether the lack of discovery was in any way due to fault or delay on the part of the non-movant; (2) whether the non-movant filed a sufficient Rule 56(f) affidavit explaining: (i) what facts are sought and how they are to be obtained, (ii) how those facts are reasonably expected to create a genuine issue of material fact, (iii) what effort the affiant has made to obtain them, and (iv) why the affiant was unsuccessful in those efforts; and (3) whether the non-movant provided any basis for its belief that further discovery would alter the outcome of the summary judgment motion.

requirements themselves have been modified by N.Y. Gen. Oblig. Law § 5-1103, which provides that:

> [a]n agreement, promise or undertaking to change or modify, or to discharge in whole or in part, any contract … shall not be invalid because of the absence of consideration, provided that the agreement, promise or undertaking changing, modifying, or discharging such contract … shall be in writing and signed by the party against whom it is sought to enforce the change, modification or discharge, or by his agent.

Accordingly, so long as there exists a writing signed by the party to be charged, consideration is not required to modify a contract – all that is needed is an offer and acceptance of the new contractual terms. Camrex Contractors (Marine), Ltd. v. Reliance Marine Applicators, Inc., 579 F. Supp. 1420, 1430 (E.D.N.Y. 1984).   In the present case, Defendants do not dispute that the initial, February 15, 1997  version of the Electric Chair Contract constituted an enforceable agreement. Furthermore, Defendants cannot colorably dispute that: (i) Plaintiffs offered to modify the Electric Chair Contract by letter dated December 14, 1997; and (ii) Mr. Bernstein accepted that offer and evinced his acceptance by counter-signing the offer and returning it to Plaintiffs, thereby eliminating any need for consideration. Accordingly, there simply is no basis for Defendants to contend that the Electric Chair Contract is invalid as modified – at a bare minimum, Mr. Bernstein's signature on the December 14, 1997 modification raises a fact question. Defendants' motion for summary judgment therefore should be denied.

**IV.    Alternatively, There is a Question of Fact with Respect to Whether the Parties Intended to Effect a Novation of the Electric Chair Contract**

Assuming, arguendo, that Defendants' "novation" argument can survive its facial irrelevance, the question ought not be resolved on a motion for summary judgment. Under New York law, in order to demonstrate a novation, four elements must be present: (i) a previously valid obligation; (ii) agreement of all parties to a new contract; (iii) extinguishment of the old contract; and (iv) a valid new contract. In re Balfour MacLaine Int'l Ltd., 85 F.3d 68, 83 (2d Cir.

13

1996). To establish a novation, there must be a clear and definite intention on the part of all the concerned parties that such is the purpose of the agreement. <u>Yahaya v. Hua</u>, 1989 U.S. Dist. LEXIS 14115 at * 12 (S.D.N.Y. 1989). Even so, "[c]onsent to a novation need not be express but may be implied from all the facts and circumstances." <u>Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.</u>, 736 F. Supp. 1281, 1283 (S.D.N.Y. 1990).

In the present case, Defendants erroneously suggest that Plaintiffs have failed to satisfy the second and third prongs of the novation analysis – that is, bilateral agreement to a new contract and extinguishment of the former contract. (<u>See</u> Def. Memo at ¶ 25). This position is simply wrong inasmuch as Plaintiffs have come forward with a second, signed contract between the parties bearing a new date – December 14, 1997 – and a new performance term, namely "1998 or longer if needed." Defendants simply cannot be heard to argue that Mr. Bernstein's signature on the second contract does not make manifest his agreement to the new contract. Nor can Defendants argue that the December 14, 1997 contract fails to extinguish the February 15, 1997 agreement, considering that it was executed by Mr. Bernstein before the February 15, 1997 agreement expired by its terms. Furthermore, Defendants – by their conduct – further evinced their intent to effect a novation of the February 15, 1997 contract. See e.g., <u>Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.</u>, <u>supra</u>; <u>Schloss Bros. & Co. v. Bennett</u>, 260 N.Y. 243, 248 (1932) ("[T]he consent to enter into the new contract may be implied by conduct.") Namely, Defendants – between 1998 and 2007 – repeatedly encouraged Plaintiffs to expend their time and resources in pursuit of Electric Chair's authentication. <u>See</u> Sands Decl. at ¶¶ 12-13. This behavior hardly is consistent with Defendants' newly-discovered expectation that the term for Plaintiffs' performance was limited to 1997.

14

In any event, it is well-established that "[w]hether the actions of the parties constitute a novation is determined by the intentions of the parties." <u>Auto Style Leasing v. Evans</u>, 1995 U.S. Dist. LEXIS 4228 at * 25 (S.D.N.Y. 1995) (internal quotations omitted). Accordingly, it is "a determination that is best made by the fact finder." <u>May Dep't Stores Co. v. International Leasing Corp.</u>, 1 F.3d 138, 140 (2d Cir. 1993). Therefore, Defendants' motion for summary judgment should be denied.

V.    **Defendants are Equitably Estopped from Disputing the Validity of the Modified Electric Chair Contract and from Demanding the Immediate Return of Electric Chair.**

In addition, Defendants should be equitably estopped from disputing the validity of the modified Electric Chair Contract, and also from demanding the immediate return of the Electric Chair painting. In New York, it is well-established that:

> [t]he purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted. The law imposes the doctrine as a matter of fairness. Its purpose is to prevent someone from enforcing rights that would work injustice on the person against whom enforcement is sought and who, while justifiably relying on the opposing party's actions, has been misled into a detrimental change of position. <u>Matter of Shondel J. v. Mark D.</u>, 7 N.Y.3d 320, 326 (2006).

Put another way, under New York law, equitable estoppel requires a showing of: (i) an act constituting a concealment of facts or a false misrepresentation; (ii) an intention or expectation that such act will be relied upon; (iii) actual or constructive knowledge of the true facts by the wrongdoers; and (iv) reliance upon the misrepresentations that causes the innocent party to change its position to its substantial detriment. <u>General Elec. Capital Corp. v. Eva Armadora, S.A.</u>, 37 F.3d 41, 45 (2d Cir. 1994). Each of these elements are present in the instant case.

15

First, Defendants concealed or misrepresented their intentions regarding the Electric Chair Contract, by falsely indicating their willingness to provide Plaintiffs with as long a time as they needed in order to secure its authentication. (See Sands Decl., Exhibit "C"). Defendants were well aware of the challenges presented with respect to authenticating Electric Chair, and constantly encouraged Plaintiffs to press on in their efforts to validate the painting. Accordingly, Defendants reaffirmed and reiterated their misrepresentations over the course of a decade, when in fact they intended all along to demand the return of Electric Chair – thereby frustrating Plaintiffs' ability to perform the Electric Chair Contract and receive the benefit of their bargain – as soon as it appeared likely that authentication of the painting was possible.

Second, Defendants had every intention and expectation that Plaintiffs would rely upon their ongoing series of misrepresentations, because of their long – almost familial – relationship with Plaintiffs, and because they constantly reiterated their misrepresentations. Furthermore, Defendants intended for Plaintiffs to rely on their misrepresentations because they stood to profit from Plaintiffs' hard work. Specifically, Defendants intended for Plaintiffs to put in years of effort toward Electric Chair's authentication, bringing the painting to the cusp of validation. Then, Defendants planned to demand the painting's immediate return, thereby preventing Plaintiffs from reaping the benefit of the bargain and harvesting the painting's increased value for themselves.

Third, Defendants had actual or constructive knowledge of the true facts, as evidenced by their consistent acknowledgement of Plaintiffs' efforts over the course of a decade, followed by their immediate demand for Electric Chair's return once it appeared as if Plaintiffs' efforts were approaching fruition.

16

Finally, Plaintiffs relied upon Defendants' misrepresentations to their substantial detriment, because – based on Defendants' misrepresentations and concealment – they expended a tremendous amount of time, effort, and money working toward Electric Chair's authentication.

While equitable estoppel plainly should foreclose Defendants' cynical attempt to snatch away the fruit of Plaintiffs' years of Sisyphean effort, "[w]hether equitable estoppel applies in a given case is ultimately a question of fact." Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001). Summary judgment therefore is inappropriate and, therefore, Defendants' summary judgment motion should be denied.

## VI.  Defendants are Promissorily Estopped from Disputing the Validity of the Modified Electric Chair Contract and from Demanding the Immediate Return of Electric Chair

Furthermore, promissory estoppel applies to bar Defendants from disputing the validity of the modified Electric Chair Contract, and also from demanding the immediate return of the Electric Chair painting. There is a difference between claims premised on promissory estoppel those based on equitable estoppel. Whereas equitable estoppel requires reliance on a misrepresentation, promissory estoppel requires reliance on a promise, or a misstatement of future intent. DePace v. Matsushita Elec. Corp. of Am., 2004 U.S. Dist. LEXIS 13316 at * 25 - * 26 (E.D.N.Y. 2004). In New York, the elements of promissory estoppel are as follows: (i) a clear and unambiguous promise; (ii) a reasonable and foreseeable reliance by the party to whom the promise is made; and (iii) an injury sustained by the party asserting the estoppel by reason of the reliance. Cyberchron Corp. v. Calldata Sys. Dev., 47 F.3d 39, 44 (2d Cir. 1995). Each of these elements is present in the instant case.

First, Defendants clearly and unambiguously promised that Plaintiffs could have as long as needed to authenticate Electric Chair. Indeed, Defendants constantly reiterated and reasserted

17

this promise over the course of a decade, by regularly encouraging Plaintiffs to press on with their efforts.

Second, Plaintiffs' reliance on Defendants' promise was both reasonable and foreseeable, as evidenced by the fact that: (i) Plaintiffs actually reduced Defendants' promise to written form and had Mr. Bernstein sign it; and (ii) the parties had a long, close, confiding relationship with one another, such that Defendants knew Plaintiffs trusted them completely. (See Sands Decl. at ¶ 28).

Third, Plaintiffs have suffered a serious injury by reason of their reliance, inasmuch as they have spent a great deal of time, effort, and money in their effort to validate Electric Chair, yet Defendants now attempt to renege on their promises, invalidate the Electric Chair Contract, and strip Plaintiffs of the fruits of their labor.

At a minimum, Plaintiffs have raised substantial questions of fact concerning the nature of Defendants' promise, Plaintiffs' reliance, and Plaintiffs' resulting injuries. Accordingly, summary judgment is inappropriate.

**VII.  Where a Contract is Silent with Respect to a Time for Performance, the Reasonableness of any Implied Performance Term is a Fact-Intensive Inquiry that Precludes Summary Judgment.**

In a highly selective and inaccurate recitation of the case law, Defendants erroneously contend that Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007) stands for the proposition that "though no time for performance was agreed upon in the 1997 agreement, New York law finds an indefinite time period unreasonable." (Def. Memo at ¶ 26). In fact, the applicable portion of Guilbert v. Gardner provides that "[w]here a contract does not specify a date or time for performance, New York law implies a reasonable time period." Id. at 149. Defendants' attempt to convert a fact-specific inquiry into an ironclad rule of law is as transparent as it is bankrupt.

18

Defendants, however, do not stop there. They cite – correctly – to <u>Falco Construction Corp. v. Summit General Contracting Corp.</u>, 760 F.Supp. 1004, 1012 (E.D.N.Y. 1991) for the proposition that "an agreement that does not contain a provision fixing its duration will be interpreted to last for a reasonable amount of time." (Def. Memo at ¶ 26). However, Defendants neglect to mention the <u>very next sentence</u> in the case, which states that "[i]n determining what is a reasonable time the fact finder should consider the facts and circumstances of the particular case, including the subject matter of the contract, what the parties contemplated at the time of contract, and the circumstances surrounding performance." <u>Falco Construction Corp.</u>, <u>supra</u> at 1012. <u>See also</u> <u>Zev v. Merman</u>, 73 N.Y.2d 781, 783 (1988) ("What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case ... Included within a court's determination of reasonableness are the nature and object of the contract, the previous conduct of the parties, the presence or absence of good faith, the experience of the parties and the possibility of prejudice or hardship to either one, as well as the specific number of days provided for performance ... The determination of reasonableness must by its very nature be determined on a case-by-case basis.") (Internal quotations and citations omitted). Indeed, as this Court repeatedly has noted, "[t]he question of what is a reasonable period of time for performance of a particular contract is a question of fact for a jury, unless the facts are undisputed, in which case the question becomes one appropriate for summary judgment." <u>Smith Barney, Harris Upham & Co. v. Liechtensteinische Landesbank</u>, 866 F. Supp. 114, 117 (S.D.N.Y. 1994); <u>Enzo Biochem v. Johnson & Johnson</u>, 1992 U.S. Dist. LEXIS 15723 at * 21 (S.D.N.Y. 1992) (same).

In light of the foregoing cases, Defendants' self-serving, untested, conclusory contention that "[a] time period of ten (10) years was more than reasonable for Sands to achieve Electric

Chair's authenticity [sic]" simply is unavailing. (Def. Memo. at ¶ 26). Significant fact questions remain with respect to the actual reasonableness of the time period, under the discrete circumstances of this case, including: (i) whether 10 years or more is reasonable in the context of a contract to authenticate a rare artwork; (ii) whether 10 years or more is reasonable in light of the slow-moving art authentication process; (iii) whether the previous conduct of the parties warrants a performance period of 10 years or more; (iv) whether the specific experience of the parties warrants a performance period of 10 years or more; and (v) whether Plaintiffs will be seriously prejudiced by working on this labor-intensive, Byzantine process for a decade, then having the fruits of their labor snatched away by Defendants at the eleventh hour. These are questions for the factfinder; they cannot be answered by conclusory statements in Defendants' memorandum. Summary judgment therefore should be denied.

## VIII.    The Martinson Coffee Contract Satisfies the Statute of Frauds.

As a threshold matter, it appears that N.Y. Gen. Oblig. Law § 5-701 – not N.Y. U.C.C. § 2-201 – provides the applicable Statute of Frauds, because the Martinson Coffee Contract primarily involves the provision of services, rather than a transaction in goods. "In determining whether or not a contract is one of sale or to provide services, we must look to the 'essence' of the agreement." North American Leisure Corp. v. A & B Duplicators, Ltd., 468 F.2d 695, 697 (2d Cir. 1972). A contract is for service, rather than sale, when service predominates, and the sale of items is collateral or incidental. Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 742 (2d Cir. 1979).

Section 5-701(a) states, in pertinent part, that:

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

... By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime ...

Defendants, in arguing that the Martinson Coffee Contract is barred by the Statute of Frauds, therefore elide the main issue – whether the Martinson Coffee Contract conceivably could be performed within one year. As the New York Court of Appeals has noted:

> New York law provides that an agreement will not be recognized or enforceable if it is not in writing and "subscribed by the party to be charged therewith" when the agreement "[b]y its terms is not to be performed within one year from the making thereof" ... We have long interpreted this provision of the Statute of Frauds to encompass only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year' ... As long as the agreement may be fairly and reasonably interpreted such that it may be performed within a year, the Statute of Frauds will not act as a bar however unexpected, unlikely, or even improbable that such performance will occur during that time frame ... Cron v. Hargro Fabrics, 91 N.Y.2d 362, 366-367 (1998) (internal quotations and citations omitted).

See also Guilbert v. Gardner, 480 F.3d 140, 151 (2d Cir. 2007) (same). Furthermore:

> [t]he practice of the New York courts has been to construe this one-year provision of the statute narrowly to give effect to oral contracts which are capable of being performed within one year. Thus, the one-year provision has been held to bar enforcement of oral contracts only in those cases where the contract is by express stipulation not to be performed within a year and not to cases in which the performance of the agreement depends upon a contingency which may or may not happen within the year. Weisse v. Engelhard Minerals & Chemicals Corp., 571 F.2d 117, 119 (2d Cir. 1978) (internal quotations and citations omitted).

In the present case, the Martinson Coffee Contract plainly could have been performed within one year, as it called for Defendants to pay Plaintiffs an agent's fee "based upon the final sales price" of Martinson Coffee at auction which was scheduled to take place shortly after the agreement was made. Defendants cannot be heard to claim that there was "absolutely no possibility in fact and law of full performance" – i.e., sale of Martinson Coffee at auction and concomitant payment of the five percent agent's fee to Plaintiffs – within one year. Nor can Defendants colorably contend that the Martinson Coffee Contract contained any express

21

stipulation that it would not be performed within one year. Accordingly, the Statute of Frauds does not apply to void the contract. At a bare minimum, genuine questions of material fact preclude summary judgment in this matter.

**IX.    Defendants are Promissorily Estopped from Denying the Validity of the Martinson Coffee Contract.**

As noted, <u>supra</u>, the elements of promissory estoppel are as follows: (i) a clear and unambiguous promise; (ii) a reasonable and foreseeable reliance by the party to whom the promise is made; and (iii) an injury sustained by the party asserting the estoppel by reason of the reliance. <u>Cyberchron Corp.</u>, <u>supra</u>, 47 F.3d at 44. Because Plaintiffs easily meet each of these elements, Defendants are estopped from denying the validity of the Martinson Coffee Contract.

First, Defendants made a clear and unambiguous promise, as evidenced by the very language contained in Mr. Bernstein's July 24 2006 correspondence to Plaintiffs:

> **It's not that we don't love you or not appreciate your efforts and interest and will compensate you with a finders/agents/whatever fee based upon the final sale price [of Martinson Coffee at auction]** … (Exhibit Q) (emphasis added).

Second, Plaintiffs reasonably and foreseeably relied on Defendants' promise, inasmuch as the parties had a long, close, confiding relationship with each other (Sands Decl. at ¶ 28), Defendants actually put their promise in writing and sent it to Plaintiffs (Exhibit "Q"), and Defendants corresponded with Plaintiffs during the several months leading up to the auction, seeking and receiving Plaintiffs' advice on the auction process. (Sands Decl. at ¶ 23; Exhibit "R").

Finally, Plaintiffs suffered a clear injury as the result of their reliance, inasmuch as they: (i) did not press their legitimate claim to serve as the exclusive dealer of Martinson Coffee; (ii) have been denied their $170,000.00 agent's fee; and (iii) expended considerable time and effort

22

advising Defendants on the sale, without compensation, in anticipation of their promised agent's fee.

Though the fact that the Martinson Coffee Contract could be performed within one year plainly removes it from the ambit of the Statute of Frauds, it is worthwhile to note that Defendants are promissorily estopped from asserting the Statute of Frauds in the first instance. In order for promissory estoppel to negate the Statute of Frauds, the injury sustained by a plaintiff must be unconscionable. See Cyberchron Corp. v. Calldata Sys. Dev., 47 F.3d 39, 44 (2d Cir. 1995). In this context, unconscionable injury is defined as an injury "beyond that which flows naturally from the non-performance of the unenforceable agreement." Multi-Juice, S.A. v. Snapple Bev. Corp., 2006 U.S. Dist. LEXIS 66913 at * 13 (S.D.N.Y. 2006). In the present case, Plaintiffs injuries clearly extend beyond mere expectation damages, inasmuch as Plaintiffs not only lost their five percent agent's fee on the Sotheby's sale, but also: (i) were deceived by Defendants into abandoning their right to serve as exclusive dealer for Martinson Coffee; (ii) suffered incalculable damage to their professional reputations as the result of Defendants' manipulative behavior; and (iii) were tricked by Defendants into providing valuable advisory services prior to the auction. Under these circumstances – and assuming that the Statute of Frauds applies, which Plaintiffs do not concede – promissory estoppel should bar Defendants from asserting that defense in the first instance.

## X.    Defendants' Request for Leave to Amend its Answer and Add a Counterclaim for Conversion Should be Denied as Futile.

Defendants' request for leave to amend their pleading should be denied, as it fails – both procedurally and substantively – on multiple levels. Initially, in order for a court to determine whether the interests of justice are served by an amendment, parties must state their reasons for seeking amendment with the particularity required of all motions by Fed. R. Civ. P. 7(b)(1). See

23

also Smith v. Planas, 151 F.R.D. 547, 550 (S.D.N.Y. 1993). An indispensable component of this obligation is that a party seeking amendment must provide the court and opposing counsel with a copy of the proposed amendment. Smith, 151 F.R.D. at 550 ("since one of the grounds for denial of leave to amend is the legal sufficiency of the proposed pleading . . . the requirement to submit the proposed pleading with the moving papers is elementary common sense"); Richardson Greenshields Secur., Inc. v. Mui-Hin Lau, 113 F.R.D. 608, 610 (S.D.N.Y. 1986). Here, Defendants' request for leave to amend consists of nothing more than a single paragraph without any discussion of the elements of the underlying cause of action sought to be added as a counterclaim and as such, should not even warrant consideration by the Court.

In addition, the Defendants' request for leave to amend should be denied because any such request would be futile. See Tocker v. Philip Morris Cos., Inc., 470 F.3d 481, 491 (2d Cir. 2006) (holding that "a motion for leave to amend a complaint may be denied when amendment would be futile"); Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003)(same). Futility in this case strikes at both the validity of the claim as well as its timeliness.

Under New York law, conversion constitutes "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." Durow v. GMC, 2008 U.S. Dist. LEXIS 31965 (W.D.N.Y. 2008). The two (2) key elements are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights. Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43 (2006). Additionally, a plaintiff must articulate actual damage as a direct result of the alleged conversion. McCall v. Leader, 268 A.D.2d 208 (1st Dep't 2000) (no recovery for conversion because plaintiff failed to adduce evidence of damages attributable to the alleged conversion); Ehrlich v. Hambrecht, 2005 NY Slip Op 50155U, 7 (N.Y.

24

Sup. Ct. 2005) (holding that, as a matter of law, failure to establish actual damage is fatal to a claim in conversion).

Here, it is obvious that a claim for conversion would not withstand a Rule 12(b)(6) motion. Defendants do not allege, nor does any reading of the facts reveal, the existence of damages. By contrast, Plaintiffs' Complaint and supporting documentation asserts the existence of a contractual right to possess the artwork in question, thereby obviating the possibility that Plaintiffs could be liable for a counterclaim sounding in conversion. Furthermore, any conversion claim would likely be barred by the three year statute of limitations. See C.P.L.R. 214(3).[9]  This is illustrated by the Defendants own moving papers in which assert that (i) they "have been deprived of Electric Chair for over ten (10) years." (Def. Memo at ¶ 34); and (ii) the 1998 contract is "invalid" as an improper novation of the 1997 agreement. (Def. Memo at ¶ 25). Defendants essentially contend that the alleged conversion took place in 1998 upon the expiration of the 1997 contract.   Under Defendants' own version of the facts (which are disputed), their counterclaim for conversion would be time-barred.  Accordingly, Defendants' request for leave to amend to assert a counterclaim for conversion should be denied.

## CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment or for leave to amend their answer should be denied.

---

[9]     A claim for conversion accrues when the conversion occurred. Sporn v. MCA Records, Inc., 58 N.Y.2d 482, 488 (1983); Guggenheim Found. V. Lubell, 77 N.Y.2d 311, 318 (1991).

Dated: Uniondale, New York
     August 25, 2008

                    Respectfully submitted,

                    RIVKIN RADLER LLP

                    By:_____/s/_ Barry I. Levy_____
                          Barry I. Levy (BL 2190)
                          John J. Vobis, Jr.
                          Max Gershenoff
                    926 RexCorp Plaza
                    Uniondale, NY 11556-0926
                    Tel.: (516) 357-3000
                    Fax: (516) 357-3333
                    barry.levy@rivkin.com
                    *Counsel for Plaintiffs Nicholas Sands and Sands &*
                    *Company, Inc.*

2178801 v1