UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
NICHOLAS SANDS and SANDS & COMPANY, INC.,

                              Plaintiffs,                    Docket No.:
                                                             07- CV-9824 (RWS)

                  -against-

LEONARD BERNSTEIN and JANE HOLMES
BERNSTEIN,

                              Defendants.
-------------------------------------------------------------------X

### DECLARATION OF NICHOLAS SANDS

**NICHOLAS SANDS** hereby declares the truth of the following pursuant to 28 U.S.C. §

1746:

1.      I have more than twenty (20) years of experience as a fine art dealer and

consultant, and I am the President and sole owner of Sands & Company, Inc. ("S&C"), a New

York-based fine art gallery, dealership, and consultancy that I incorporated approximately 11

years ago. I have personal knowledge of the facts set forth herein.[1]

2.      During my years of art industry experience, I have developed a particular

expertise in works by the late Andy Warhol. For example:

            (i)      My writings on Warhol have been published by the Sotheby's, Christie's

and Phillips auction houses in New York as well as on internet websites.

---

[1]      In the Complaint, the actual identity of the artwork entitled "Electric Chair" work was
intentionally omitted to avoid any further adverse consequences associated with attempts to
secure authentication of the work and to protect its future saleability in the event that the work
could be authenticated. The Defendants have disregarded the basic purpose of having the
identity of the work remain anonymous by openly disclosing its title by name in the papers that
they have filed. As a consequence, the disclosure will likely serve to compromise my ongoing
efforts to have the Warhol Board authenticate the work and diminish its value even if were to be
authenticated.

(ii)    I have been interviewed by the media for my expertise on Warhol and other artists, and have been quoted and/or written about in newspaper and magazine articles including ones published by The Wall Street Journal, Art & Auction magazine, Art News, The New York Post, The Washington Post and others.

(iii)    I have professional relationships with important museums worldwide and have lent works by Warhol and others from my own private art collection to the Guggenheim Museum, the Whitney Museum, the Cooper-Hewitt Museum, the Philadelphia Museum of Art and others.

3.    I respectfully submit this Declaration in opposition to the motion by defendants Leonard Bernstein and Jane Holmes Bernstein ("Defendants" or the "Bernsteins") for summary judgment or, in the alternative, for leave to amend their answer to assert a counterclaim for conversion.

4.    Despite Defendants' deceitful attempt to wriggle free of their contractual obligations regarding the sale of the Martinson Coffee painting ("Martinson Coffee"), my records – as discussed herein – plainly indicate the existence of a valid contract, my own performance, my repeated demands that Defendants perform their end of the bargain, and Defendants' continued and unexplained refusal to do so. Furthermore, I have been damaged by the Bernsteins' refusal to perform their end of the bargain, inasmuch as I never have been paid the $170,000.00 that I am owed under the contract. At a bare minimum, there are many disputed issues surrounding my contract with Defendants, and these issues only can be resolved by a trial on the merits.

5.    Furthermore, and as set forth herein, Defendants' eleventh-hour claim that I somehow have converted the Electric Chair painting ("Electric Chair") is a fiction of their

2

imagination inasmuch as I hold the painting pursuant to another valid contract that Defendants repeatedly have reaffirmed over a ten (10) year period.

## I.     Background Regarding the Electric Chair Painting

6.      The Andy Warhol Art Authentication Board (the "Warhol Board") is the only official body recognized by the art world as authorized to certify the authenticity of Warhol paintings. In the absence of the Warhol Board's approval, Warhol works are perceived to have limited to no value for purposes of sale. In recent years, the Warhol Board has come under increasing scrutiny for its secretive, arbitrary practices and for apparent conflicts of interest among its board members. (See, e.g., November 2003 Vanity Fair report, annexed hereto as Exhibit "A"). Ultimately, on July 13, 2007, these practices and conflicts of interest forced a number of injured art collectors to file a class action lawsuit in this Court, which I understand alleges that the Warhol Board and others have engaged in a series of fraudulent and manipulative acts. See Joe Simon-Whelan et al. v. The Andy Warhol Foundation, Docket No.: 07-cv-6423 (LTS)(the "Warhol Litigation"). I understand that the Warhol Litigation seeks, among other things, an order replacing the Warhol Board as the sole authenticating authority for Warhol works, or to have the Warhol Board's authentication methods amended.

7.      On February 15, 1997, S&C entered into a contract with the Bernsteins whereby the Bernsteins engaged S&C's services in an attempt to have Electric Chair authenticated as a genuine Warhol painting. (A copy of the February 15, 1997 contract annexed hereto as Exhibit "B").

8.      Under the contract's initial terms, the Bernsteins agreed that if S&C could secure Electric Chair's authentication during 1997, they would sell the painting to me for $65,000.00. (See Exhibit "B").

3

9.      After entering into the contract with the Bernsteins on February 15, 1997, S&C embarked on an intensive multi-year effort to secure the authentication of Electric Chair.

10.     By late 1997, it became apparent that S&C would require additional time in order to have Electric Chair declared authentic. Accordingly, I approached the Bernsteins and sought their consent to extend the time period covered by the February 15, 1997 contract through 1998, or longer if needed. Under the proposed revised contractual terms, if S&C could have Electric Chair authenticated during 1998 – "or longer if needed" – the Bernsteins would agree to sell the painting to me for $65,000.00.

11.     On December 14, 1997, Leonard Bernstein ("Mr. Bernstein") signed the proposed modified contract, thereby giving S&C until 1998 – "or longer if needed" – to secure the authentication of Electric Chair. (A copy of the December 14, 1997 modified contract is annexed hereto as Exhibit "C").

12.     Despite S&C's initial efforts, the Warhol Board has denied Electric Chair's authenticity on at least two occasions since 1997. However, the Warhol Board never provided any reason for rejecting Electric Chair's authenticity, and over the course of the past ten (10) years the Warhol Board's standards and practices increasingly have been called into question in media reportage and in civil litigation. Furthermore, from my own experience and efforts, I know that initial authenticity rejections are subject to being overturned through concerted, long-term work. As a result, S&C steadfastly has persisted in its efforts to have Electric Chair declared a genuine Warhol painting.

13.     The Bernsteins repeatedly approved of S&C's continued attempts to secure the authentication of Electric Chair over the past ten (10) years. For instance, after signing the

4

December 14, 1997 modified contract, the Bernsteins expressed support for S&C's ongoing
efforts in the following manner:

(i)     On September 13, 2001, Mr. Bernstein wrote to me and expressed approval after I
        met with individuals in the New York Attorney General's office regarding
        structural problems within the Warhol Board's authentication process. (September
        13, 2001 correspondence annexed hereto as Exhibit "D").

(ii)    On November 5, 2003, Mr. Bernstein wrote to me and expressed interest in
        creating a rival authenticating body to challenge the Warhol Board's
        authentication monopoly. (November 5, 2003 correspondence annexed hereto as
        Exhibit "E").

(iii)   On November 15, 2003, I wrote to Mr. Bernstein and advised him of S&C's
        continuing efforts to authenticate Electric Chair, including consideration of
        lawsuits, government intervention, establishment of a new authenticating body,
        and meetings with similarly-situated individuals. I specifically noted that this
        work – by its very nature – would require long-term effort.[2]  On November 16,
        2003, Mr. Bernstein wrote back to me, and suggested the establishment of an
        industry-funded organization charged solely with the authentication of works of

---

[2]     This point was recently highlighted in an August 23, 2008 New York Times article
describing ongoing efforts to have a work attributed by some to Leonardo da Vinci declared
authentic, the writer stated as follows: "Modern connoisseurship, a convergence of wide-ranging
technical examinations and the expert's eye, remains an imperfect science. And building a
consensus around an attribution can be a long and challenging process.... Mr. Chapman of the
British Museum said, 'There will be a scholarly opinion, but it takes time to make its way
through the system. The scholarly world needs time to digest this thing; it can't make a snap
decision.'... 'If one expert says yes and the other says no, it makes it unsellable. No one will buy
until you have certainty.'"

art, which could rival the Warhol Board. (A copy of the November 15-16, 2003 correspondence is annexed hereto as Exhibit "F").

(iv)     On November 16, 2003, I wrote to Mr. Bernstein and – among other things – advised him that I had approached the International Foundation for Art Research and the conservation laboratory at the Guggenheim Museum in the hope of securing their assistance in authenticating Electric Chair. On November 17, 2003, Mr. Bernstein applauded my efforts and responded with additional suggestions regarding the establishment of an entity that could rival the Warhol Board. (A copy of the November 16-17, 2003 correspondence is annexed hereto as Exhibit "G").

(v)      On June 3, 2004, Mr. Bernstein wrote to me and asked whether there were any developments regarding Electric Chair's authentication. I responded on June 8, 2004 by advising him that I planned to visit London within the next few weeks for an important meeting concerning the painting. On June 24, 2004, I advised Mr. Bernstein that I conducted that London meeting and participated in a conference call with a journalist regarding the Warhol Board's practices. Mr. Bernstein wrote back to me on June 24, 2004, and expressed support regarding S&C's continued efforts. (A copy of the June 2004 correspondence is annexed hereto as Exhibit "H").

(vi)     On February 13, 2005, the Bernsteins paid me a visit in New York, during which we discussed S&C's ongoing efforts to secure Electric Chair's authentication. Afterwards, on February 14, 2005, Mr. Bernstein wrote me to express his hope

6

that all of S&C's work would ultimately pay off. (A copy of the February 14, 2005 correspondence is annexed hereto as Exhibit "I").

(vii)   On about May 20, 2005, I wrote to Mr. Bernstein and advised him of another art authentication project that I successfully completed for another client (having proven that a work initially denied as a fake was in fact authentic and finally accepted as so by the experts), and expressed my hope that S&C would be able to achieve a similar result with Electric Chair. On May 20, 2005, Mr. Bernstein wrote back to me and also expressed the hope that S&C would be able to achieve similar success and secure Electric Chair's authentication through my continued efforts. (A copy of the May 20, 2005 correspondence is annexed hereto as Exhibit "J").

(viii)  In about November 2005, Mr. Bernstein expressed an interest in retrieving Electric Chair from S&C so that he and his wife might temporarily enjoy the work, but allowed that S&C would continue working on its authentication under the terms set forth in the December 14, 1997 modified contract. On November 24, 2005, I wrote to Mr. Bernstein, memorialized our discussion, expressed my willingness to return the painting on a temporary basis, and reiterated my intention to continue working on the project pursuant to the December 14, 1997 modified contract. On November 25, 2005, Mr. Bernstein wrote back to me and expressed continued support for S&C's efforts, noted that once I returned Electric Chair to him I could have it back whenever I needed it (for authentication purposes), and suggested that he would pick up the painting in April-May 2006,

7

when he would be in New York. (A copy of the November 24-25, 2005 correspondence is annexed hereto as Exhibit "K").

(ix)    Though Mr. Bernstein did come to New York during the spring of 2006, he never retrieved Electric Chair, nor did he make any attempt to retrieve the painting. In fact, Bernstein told me during this visit that S&C could "just keep the painting" as it was of "no use" to him.

14.    As noted above, on July 13, 2007 a class action lawsuit was commenced in this Court, seeking – among other things – either to replace the Warhol Board as the sole authenticating authority for Warhol works, or to amend the Warhol Board's authentication methods. On July 17, 2007 – only four days after the lawsuit was filed and the news media published major stories concerning the litigation – the Bernsteins' attorney sent a letter to S&C demanding the immediate return of Electric Chair. (A copy of the July 17, 2007 correspondence is annexed hereto as Exhibit "L").

15.    S&C actively continues to seek Electric Chair's authentication up through today. Indeed, since 1997 it has engaged in sustained and continuous efforts toward that end, including but not limited to following:

- Prepared formal submission of the work three separate times to Andy Warhol Art Authentication Board – each submission involved the preparation of extensive documentation and detailed letters directed to the Board;

- Retained professional art conservator to clean work prior to submission;

- Retained professional art photographer to take photographs of and produce color transparencies and prints of the work in connection with submissions;

- Secured attestation of original seller for purposes of attempting to establish authenticity of work;

- Secured written attestations (at my cost) from approximately 6 well known Warhol Associates for purposes of supporting resubmission of Electric Chair for

8

authentication by the Board, including local and out of town travel to meet with each of them;

- Travelled to Sotheby's London to inspect other Electric Chair works being offered for auction for purposes of supporting re-submission application to the Board – this involved precise measurements of their image dimensions, outer overall dimensions, ink, canvas and wood stretcher characteristics;

- Inspected other Electric Chair works being offered for auction at both Sotheby's and Christie's in New York for purposes of supporting re-submission application to the Board – this involved precise measurements of their image dimensions, outer overall dimensions, ink, canvas and wood stretcher characteristics;

- Meetings with various New York gallery owners to seek support for authentication of Electric Chair;

- Meetings with former Warhol Board member to seek support for authentication of Electric Chair;

- Conducted extensive research through internet, New York Public Library, gallery and museum websites (including UCLA Art Museum) concerning the owners of Electric Chair prior to Bernsteins;

- Went to Archives of American Art offices in New York to inspect partial Eleanor Ward Gallery archives there (contacted AAA's branch in Washington DC to inspect the remainder) seeking to find some reference of the work of art within the archives that might convince Warhol Board to authenticate Electric Chair;

- Travelled to Warhol Museum in Pittsburgh to research Electric Chair in the museum's archives, spending two full days searching for any and all information that might convince Warhol Board to authenticate the work of art;

- Travelled to London to go to Tate Gallery (museum) and inspected another Electric Chair in its permanent collection that is similarly colored and has similar visual characteristics as the present work, in an effort to compare the two paintings and thus prove the authenticity of the latter;

- Conducted research at the Museum of Modern Art Library and reviewed multiple boxes of Warhol newspaper clippings and other ephemera from 1964-65 in search of information that might prove Electric Chair's authenticity;

- Researched the existence and location of other known Electric Chairs in other collections (e.g. Museum of Modern Art, Philadelphia Museum of Art, Menil Collection, private collections) in an effort to find similarities between them and present Electric Chair and thus support authentication upon resubmission to the Board;

9

- Reviewed and studied photographs and details on all other known Electric Chair works in the multi-volume "Andy Warhol Paintings" catalogue in search of information to support authentication of present Electric Chair;

- Researched and compiled numerous Warhol handwriting samples that might convince handwriting experts to authenticate Warhol signature on Electric Chair;

- Researched numerous books and other publications (including online sources) for photographs taken in Warhol's studio between 1963 and '65 (including series of photographs taken by Warhol associate Billy Name showing many Electric Chair works in Warhol's studio lying on the floor) in an effort to find the present work pictured there and thus definitively prove the painting's authenticity;

- Researched and considered various scientific methods (e.g. pigment and ink analyses, canvas thread count, etc.) that might serve to assist in establishing Electric Chair's authenticity;

- Contacted International Center for Art Intelligence and Guggenheim Museum conservation laboratory requesting performance of specific scientific methods to assist in establishing Electric Chair's authenticity;

- Solicited International Foundation for Art Research (IFAR) seeking their assistance in establishing Electric Chair's authenticity.

16.    As illustrated above, S&C has expended considerable time, effort, and money in these efforts over the past 10 or more years and the Bernsteins have been kept apprised of these on an ongoing basis. The Bernsteins have never contributed towards the ultimate goal of securing the authentication of the work nor has S & C ever requested any form of reimbursement because the time, labor and expense were built in to the agreed purchase price that was established when the agreement with the Bernsteins was reached.[3]

17.    The Bernsteins are well aware of the fact that S&C cannot secure Electric Chair's authentication without having the actual painting in its possession. From the ongoing media

---

[3]    In other cases where I have been requested to perform similar functions without it being tied to a right to purchase the work, I would generally bill the client for all of my time and the actual costs which can amount to tens of thousands of dollars depending upon the level of effort and expenditure necessary to achieve the ultimate result.

coverage associated with the litigation, the Bernsteins also are aware that the pending federal class action lawsuit against the Warhol Board is likely to effect changes in the Warhol Board's review process that would favor Electric Chair's prospects for authentication. Indeed, the sole reason that the Bernsteins have demanded Electric Chair's immediate return is to destroy S&C's ability to have the painting authenticated, and thereby prevent S&C from reaping the benefit of its bargain – i.e., the right to purchase Electric Chair for $65,000.00, according to the terms of the February 15, 1997 contract, as modified on December 14, 1997 and reaffirmed continuously since that time.

## II.    Background Regarding the Martinson Coffee Painting

18.    On May 24, 2006, Mr. Bernstein wrote to me and recounted discussions with Sotheby's and the Boston Museum of Fine Arts (the "MFA") regarding a possible sale of the Martinson Coffee painting, which Defendants owned.[4]  Specifically, Mr. Bernstein indicated that Sotheby's evinced a willingness to list Martinson Coffee in their auction catalogue with a pre-auction value of $2-3 million, and that he had engaged in discussions with the MFA regarding a possible gift annuity transfer.  I responded to Mr. Bernstein on May 25, 2006, in an effort to convince him to permit S&C to sell Martinson Coffee privately as per our earlier discussions. (A copy of the May 24-25, 2006 correspondence annexed hereto as Exhibit "M").

19.    On June 21, 2006, Mr. Bernstein wrote me to say that he did not think that the MFA would be able to purchase Martinson Coffee, and that the MFA's inability to purchase the painting left Sotheby's and me as the two prospective seller's agents. Mr. Bernstein added,

---

[4]    My interest in Martinson Coffee started in 1996 when I contacted Mr. Bernstein to inquire about whether he was interested in offering the work to me after having learned that he owned that work of art. That was my first contact with him. He indicated at the time that while he did not have any present interest in selling the work that he would let me know if circumstances changed.

however, that unless S&C could produce "something concrete," he would sell Martinson at auction through Sotheby's. (A copy of the June 21, 2006 correspondence is annexed hereto as Exhibit "N").

20.     On July 12, 2006, Mr. Bernstein wrote to reiterate his intent to sell Martinson Coffee through Sotheby's unless S&C could produce "anything concrete" within the next few days. (A copy of the July 12, 2006 correspondence is annexed hereto as Exhibit "O").

21.     After receiving Mr. Bernstein's July 12, 2006 correspondence, I spoke with him by telephone. During this conversation, and in a follow-up email in which I confirmed it, I advised Mr. Bernstein that I thought S&C could sell Martinson Coffee for approximately $5 million, representing – less my 10 percent commission (i.e. $500,000) – a net profit of $4.5 million for the Bernsteins. Mr. Bernstein agreed to hold Martinson Coffee exclusively for S&C so that S&C could offer it to clients at the $5 million price, so long as the Bernsteins received $4.5 million net. Mr. Bernstein also agreed to ship Martinson Coffee to me, upon request, if needed to show the painting to clients. Based upon Mr. Bernstein's representations, and at his urging, I began to contact S&C's clients and offer Martinson Coffee for sale. I never would have contacted clients and offered the painting for sale if Mr. Bernstein had not represented that he was willing to ship it to me. Fine art dealers live by their reputations, and it is extremely damaging to a dealer's reputation if he represents that he has a painting of this magnitude to sell, then cannot produce the painting when a client asks to view it. No potential purchaser will make an offer on a work of art of this magnitude (especially a $5,000,000 offer) without an actual viewing. This is customary in the trade.

22.     Between July 18, 2006 and July 23, 2006, I wrote to Mr. Bernstein several times to apprise him of S&C's clients' interest in Martinson Coffee, and to ask him to ship Martinson

Coffee to S&C so that its' clients could view the painting. (A copy of the July 18-23 correspondence is annexed hereto as Exhibit "P"). On July 23, 2006, I advised Mr. Bernstein that a prospective buyer had expressed strong interest in Martinson Coffee, but the buyer's agent demanded to see it in order to be certain that S&C could produce the painting for sale. (See Exhibit "P").

23.    On July 24, 2006, Mr. Bernstein wrote me to say that the Bernsteins had decided to sell Martinson Coffee through Sotheby's, despite their agreement to hold the painting exclusively for sale through S&C at the $4.5 million net price. In that same correspondence, the Bernsteins offered (as an alternative) to modify their agreement with me. Specifically, instead of offering Martinson Coffee through S&C, the Bernsteins agreed to pay me an agent's fee based upon the painting's final sale price at auction through Sotheby's. (A copy of the July 24, 2006 correspondence annexed hereto as Exhibit "Q"). When I spoke with Mr. Bernstein by telephone shortly after receiving his correspondence, he said that the Bernsteins would pay me five (5%) percent of the sale price from the upcoming Sotheby's auction and that he had been told by Sotheby's that the work might well sell for $12 million or more. Essentially, the Bernsteins promised that if I would forego the 10 percent commission that I stood to earn in a private sale, and abandon my claims regarding their failure to offer Martinson Coffee exclusively for sale through S&C and to produce Martinson Coffee for inspection by my prospective buyer, then they would pay me a five percent agent's fee on the proceeds of the upcoming auction at Sotheby's.

24.    Though I was not obligated to abandon my rights under our original agreement, I reluctantly agreed to do so in consideration for the Bernsteins' agreement to pay me a five (5%) percent agent's fee on the Sotheby's auction sale price. I accepted their offer even though I was

Case 1:07-cv-09824-RWS    Document 19    Filed 08/25/2008    Page 14 of 15

extremely upset because of the damage that the Bernsteins' behavior had caused to my professional reputation, considering that I had gone out on a limb to contact my clients and represent that I was the exclusive dealer for Martinson Coffee, only to be professionally humiliated once the Bernsteins unilaterally terminated our agreement. Nonetheless, I hoped to maintain my relationship with the Bernsteins, based on our longstanding friendship.

25.     Between July 2006 and November 14, 2006 – the date of the Sotheby's auction – I repeatedly spoke and corresponded with the Bernsteins, offering them my advice on the auction, at their request. (A copy of the July 2006 – November 2006 correspondence is annexed hereto as Exhibit "R").

26.     On about November 14, 2006, Martinson Coffee sold at auction for $3.4 million, to an unidentified buyer. I suspected that the ultimate buyer was one of the S&C clients to whom I had offered the painting in July 2006, at the Bernsteins' request. However, Mr. Bernstein would not confirm my suspicion.

27.     Though the Bernsteins had agreed to pay me a five percent agent's fee on the Sotheby's auction sale price, which amounted to $170,000.00, they never sent me my check. Accordingly, on January 7, 2007, I wrote to the Bernsteins and raised the issue. (A copy of the January 7, 2007 correspondence is annexed hereto as Exhibit "S").

28.     On January 8, 2007, I once again wrote to the Bernsteins and specifically asked when they intended to send me my five percent agent's fee. In response, on January 9, 2007 Mr. Bernstein wrote to say that the Bernsteins "have not made any decisions on any of this." I once again demanded payment on January 9, 2007. In response, on January 12, 2007 Mr. Bernstein announced the Bernsteins' intention to breach their agreement. (A copy of the January 8-12, 2007 correspondence annexed hereto as Exhibit "T").

29.    Over the course of the next several months, I repeatedly demanded payment of my five percent agent's fee, amounting to $170,000.00, on the sale of Martinson Coffee. Even so, the Bernsteins – without any justification whatsoever – have refused to tender my fee.

30.    Over the years, I developed a long, close, and confiding relationship with the Bernsteins, as evidenced by the correspondence included as exhibits to this Declaration. I regret that they now are attempting to exploit my trust and goodwill for their own personal benefit.

I declare under penalty of perjury that the foregoing is true and correct. Executed at New York, New York on August 25, 2008.

Nicholas Sands

15