# EXHIBIT A

### Judging Andy.(controversial pronouncements by the Andy Warhol Art Authentication Board)

Source: Vanity Fair
Publication Date: 01-NOV-03

Signed by the artist, certified by his estate-it's got to be an original Andy Warhol, right? Not unless the Warhol authentication board says so. But dealers and collectors are crying foul over the four-member board's perplexing verdicts, which have turned high-priced art into wall decoration

They tend to look nervous as they come, bearing their packages, to the red-brick warehouse on far-west 20th Street in Manhattan's Chelsea district. Up on the seventh floor of the Andy Warhol estate building, they add prints and paintings to the pile that gathers there three times a year. Soon enough, they get a telltale letter from the Andy Warhol Art Authentication Board. Some return to pick up their works with obvious relief, but many, many others storm back in grief or rage. "It's a depressing job," admitted a young elevator man on duty to a stunned collector on the way down not long ago. "People have so much hope, and they come out just crushed."

In the netherworld of great artists' estates, some panel of experts is usually on tap to determine the authenticity of once humble paintings that now sell for millions of dollars. They may debate, they may equivocate. None, though, has seemed so capricious as the Andy Warhol board. None has stirred such indignation, such loathing, and such fear.

Much of the fault lies with the artist himself. Sixteen years after his untimely death at 58 from complications following gallbladder surgery, Warhol is the hottest name, by far, in modern art. His silkscreened prints, with their globally recognized images, have doubled in value in the last three to five years. Prices for his important paintings have risen as much as tenfold in that period.

But as demand has increased, so has the number of forgeries. "Warhol is the most famous artist in America," says Manhattan art dealer John Woodward, "and the most faked." Forgers have a field day because Warhol was also among the world's most prolific artists-hundreds of paintings, thousands of prints-thanks to his pioneering production of "mechanized" art, for which he employed helpers both inside and outside his "Factory" sites. Forgers can start with the same photographic images Warhol did, and sometimes knock off silkscreens only an expert can distinguish from the originals. Often, as a result, the Warhol board is simply blamed as the messenger of bad news to hoodwinked buyers.

For some time, though, disturbing stories have wafted out from that red-brick building into the art world. Gallery owners and dealers have submitted works signed by Warhol or authenticated by the executors of the artist's estate, only to have the board declare them, in its words, "not the work of Andy Warhol." Works that Warhol discussed or produced in the company of Factory assistants have been denied despite multiple affidavits from those assistants. The board has even reversed its own judgments, creating huge confusion.

Unlike some such boards-sculptor Alexander Calder's, for example-the Warhol board never officially explains why it's denied authenticity to a work. That would help the forgers. So an owner is left to come up with his own theory for why the painting he bought in good faith for perhaps several hundred thousand dollars or more is now worthless.

Nor do the owners have any recourse: to have their works reviewed, they have to sign a contract by which they forgo any right to a legal appeal. The contract says the board will issue "merely an opinion," but the board's opinion is, like a king's, the only one that counts, and so over this huge domain of the global art market the board's power is absolute.

To a wide range of disgruntled gallery owners, dealers, and collectors contacted by Vanity Fair, those opinions are suspect. Few such boards, they observe, are linked to a foundation that has had troves of the late artist's work to sell-a potential conflict of interest. Critics say the board plays favorites: the same painting may be authenticated when submitted by one dealer, they suggest, but denied if submitted by a less established one.

works "not the work of Andy Warhol," does it just mean actual fakes? Or does it, as many of the stories suggest, often mean works that were by Warhol, but not in the board's opinion intended by the artist to be shown or sold as art?

And if so, how do the board's members have the gall to judge that?

Joe Simon, 39, a U.S.-born filmmaker and British art-world habitue, has spent most of the last two years pondering that very question. His harrowing odyssey with the Warhol authentication board began soon after July 2001, when he found a buyer, through a London gallery, for a Warhol painting he'd bought in 1989. Simon had paid $195,000 for the work, a red silkscreened self-portrait done in 1965. His buyer had agreed to pay $2 million. The only condition was that Simon submit the work to the Warhol authentication board.

Simon did so without hesitation, signing the legal waiver that explained, among other matters, the board's rating system: "A" for "work of Andy Warhol," "B" for "not the work of Andy Warhol," and "C" for "not able at this time to form an opinion." Shortly after, Simon was faxed a letter with the verdict: a B. He was floored.

As far as Simon could see, the painting had an impeccable provenance. Before his purchase of it from the Lang & O'Hara gallery in New York, the 24-by-20-inch work (synthetic polymer and silkscreen ink on canvas) had been handled by Christie's auction house and by Ronald Feldman, a well-known Manhattan dealer long associated with the artist. It had also been examined by Fred Hughes, Warhol's executor and the late chairman of the Andy Warhol Foundation for the Visual Arts, who wrote and signed an authentication on the back of the painting. "And before I bought it, having known Fred forever, I rang him at home and discussed it with him," Simon recalls. "The irony is that he owned one of the portraits himself."

Simon had moved in Warhol circles since coming to New York as a teenager and landing a job as an assistant for Vogue editor Diana Vreeland. Handsome and charming, he slid easily into the Factory crowd and knew Warhol personally. Over the years, as he became a movie producer (Richard III), various artists, including David Hockney, painted portraits of him. When the board denied his Warhol self-portrait in early 2002, Simon was trying to produce a sequel to the 1994 drag-queen camp classic The Adventures of Priscilla, Queen of the Desert. Appalled at what he felt to be a gross injustice, he put his work aside and embarked on a full-time campaign to prove his painting was real. It was a campaign that would immerse him in the creative chaos of Warhol's early Factory years, even as it deepened his suspicions of the authentication board.

By the late summer of 1965, as Simon already knew, Warhol at 37 had made the leap from commercial designer to Pop-art pioneer, and all but burned out as he did. His first canvases-comic-book characters, Campbell's-soup cans-had been painstakingly hand-painted, but he soon moved on to silkscreening, which hardly any other artist had tried. Not only was it faster and more profitable, but the assembly-line process of silkscreening seemed perfect for the iconic images he was producing.

By now Warhol's passion had also shifted from painting to moviemaking. It was easier-and more fun. The Factory had become a Pop version of a Hollywood studio, with Warhol-named "stars"-Baby Jane Holzer, Viva, Ultra Violet-making mind-numbingly long films of people sleeping or kissing. Warhol was also using a new handheld tape recorder to "write" a novel called A: A Novel. On the fringe of this scene, as Simon learned, was a young magazine publisher named Richard Ekstract, who'd just struck a deal with the artist. In exchange for having Warhol sit for a cover interview for his trade magazine Tape Recording, Ekstract called an executive he knew over at Norelco and persuaded him to lend Warhol one of the world's first video recorders and cameras-a $15,000 novelty.

Warhol was thrilled: how much easier to make movies with it than with a 16-mm. camera! When the short tryout period ended, Ekstract says, Warhol asked to keep the camera and recorder, with plenty of videotape, for six more months. In return, he would give silkscreened self-portraits to Ekstract and half a dozen others who'd made possible the extended loan and a related party to celebrate Warhol as an underground filmmaker. Such were the origins, Ekstract explained to Joe Simon, of Simon's own painting.

Because Warhol was so busy, Ekstract added, and because the self-portraits were for barter, not cash, Warhol delegated more of the creative work than usual. Typically, Warhol sent the image he'd chosen to

an assistant produced the painting from it. This time, however, Warhol told Ekstract to have a silkscreen printer do that final step with Andy's guidance. The point, Ekstract said with a laugh, was to save money. "He was too cheap to do it himself!"

Up at the Factory, Ekstract recalled, Warhol approved the paintings. Ekstract, who paid for the silkscreening, kept one for himself. One of the others went to an advertising man. That one, Simon determined after more sleuthing, was the one he'd bought in 1989.

Ekstract, 72, has come a long way since the early days of Tape Recording. He's published some 20 trade and consumer magazines, including the new Hamptons Cottages & Gardens. He's an art collector, keeps an apartment on Gracie Square in New York, and has a radically contemporary home on seven and a half acres in Sagaponack, Long Island, that looks like a lunar-landing module. As Simon recounted his frustrations with the board, Ekstract began to seethe. The authentication board had denied his own self-portrait some years before, but he'd shrugged off the slight: Warhol had given him the painting, and he wanted to keep it. Since then, however, more than one of his old cronies had tried to sell their paintings and, like Simon, had had them denied by the board. Ekstract encouraged Simon to keep on with his research. If he prevailed, all seven owners would benefit. If the board turned him down again, Ekstract might be willing to foot a lawsuit.

Simon kept digging. He spoke to Paul Morrissey, Warhol's Factory film director in the 1960s, who remembered the Ekstract deal and wrote a letter of support. Billy Name, the Factory's photographer at that time, corroborated Morrissey's version. Perhaps the most authoritative of the early Factory affidavits came from Warhol's Factory assistant Gerard Malanga, who helped the artist produce nearly all his early silkscreened paintings.

"The Ekstract situation was an anomaly," Malanga admits. "We never farmed out another job at that point." But, he says, "it's still valid." After all, he notes, Warhol was always experimenting with different methods. Just because this method was different at the time, he says, "how can the board say Joe's painting is not real?"

Along with Factory workers, Simon sought out three of Warhol's early dealers and champions: Sam Green, Irving Blum, and Ivan Karp. All of these art-world figures agreed that Simon's self-portrait was real. Karp was especially supportive: he, too, had had a Warhol painting denied by the board.

'I was his first art dealer, in 1961, and I was dedicated to his good cause!" the twinkly-eyed Karp, 77, declares of Warhol from the office of his venerable West Broadway gallery, called OK Harris. So Karp was stunned when a buyer to whom he'd sold a two-panel self-portrait by Warhol informed him that the then newly formed authentication board had declared it "not the work of Andy Warhol."

Karp had bought the painting in the 1960s, knowing full well that its creation had been atypical. A Michigan art professor had contacted Warhol to say that his class wished to produce a Warhol silkscreen, and could the artist advise them? Warhol blithely obliged. When the students were done, continued on page 211 continued from page 204 Warhol went to visit the class, pronounced himself delighted by the two square panels, one on top of the other, each of which bore his silkscreened image-one in silver, one in blue-and signed the upper one of them. When the professor offered to sell Karp the work, the dealer snapped it up, convinced it was merely another of the artist's experiments in method, no less legitimate than any of his other works.

To Karp, the proof was in the penmanship. "The signature was the confirming act on the part of the artist!" he declares. "That meant this is what he meant it to be!" As Karp knew, the lack of a signature on a Warhol work meant nothing: the artist produced works in such volume that he often waited until they were sold before signing them. But when Warhol did sign a work, and the signature could be confirmed, how could the board ignore it? "To be uninterested in the signature is extraordinary," Karp fumes. "That's the whole thing for authenticators of classical paintings, after all. In my 46 years in the business, I've never come across anything like this."

Karp had no choice but to take the painting back and refund the buyer his $40,000. After stewing for a while, he decided to submit the painting himself. "I figured when I submitted it under my name, from my loyalty to Warhol's career ... that they would honor that," Karp says. It came back with a denied stamp on the back of the canvas. Furious, Karp discarded that one and hung the unspoiled panel in his office.

would be worth about $90,000. Now it's just a decorative wall hanging. "And you know what?" Karp says, fuming again at the memory. "I found a paper in my files, from Vincent Fremont, confirming the picture."

Behind a big wooden desk in his loft-like Manhattan office at One Union Square, framed by rows of art books behind him, Vincent Fremont at 53 has the rumpled, shambling look of a college art professor, and a casual, self-deprecating charm to match. Yet he holds a post of high power in the art world, one that makes a lot of art dealers nervous. As exclusive agent for the Warhol foundation, which was formed in 1987, Fremont decides which galleries and museums will get Warhol shows, and which dealers will get works to sell. From all paintings, drawings, and sculpture that the foundation sells, he gets a commission: originally 10 percent, now 6 percent. Since its inception, the foundation has sold about $150 million worth of Warhol's art. Fremont, who showed up as a worshipful teenager at the Factory in 1969 to sweep the floors, is now a multimillionaire.

Fremont readily admits that in the tumultuous period after Warhol's death he authenticated Karp's double-panel self-portrait. In the absence of any authentication board at that time, he and Fred Hughes took on the thankless job, as he puts it, of judging works that came in for review. "You wouldn't believe the stories that some people brought, huge packages of stories that were totally fabricated," Fremont recalls. "It's much more complicated than you'd think." In the case of the Karp self-portrait, he remembers the circumstances: the Michigan art class, Warhol's visit. How then could the board later reverse his judgment? "The present board is its own body," Fremont says evenly. Did the board decide that work done off-site was invalid, despite Warhol's approval of it? That impression, he says without elaboration, is "understandable but not correct."

Hughes did most of the authenticating until his eyesight began to fail from multiple sclerosis. As Hughes's condition worsened, Fremont became the estate's chief authenticator. (After a protracted and painful decline, Hughes died in 2001.) Dealers began muttering that this created, at the least, an apparent conflict of interest-one that might lead Fremont to reject works presented by outsiders in order to promote sales of the foundation's own stock, for which he would get his sales commission. Fremont denies that. "It was never about commerce," he says of the authenticating. "It was about the integrity of the artist's work."

Eight years after Warhol's death, the authentication board was formed. It would be an expert panel wholly separate from, but underwritten by, the Warhol foundation, which would continue to sell Warhol's art. One member was David Whitney, a Warhol acquaintance who had once hung a show of Warhol drawings at New York's Whitney Museum of American Art. (No relation to the museum's founding family, he was, and is, architect Philip Johnson's companion.) Another, Neil Printz, was a well-regarded academic, while Georg Frei worked at the Thomas Ammann Fine Art gallery in Switzerland. Interior designer Jed Johnson, a close friend of Warhol's for many years, was a fourth member, though he would serve for little more than a year-a victim of the crash of TWA Flight 800. There was briefly one other member of the board: Vincent Fremont.

Early on, Fremont says, he realized he was once again in a tricky position: both on the authentication board and selling art as the foundation's exclusive agent. "That's when it dawned on me that I should step off," he says. "I didn't want the perception of conflict to arise, so ... I removed myself."

With Johnson's tragic death, Fremont's resignation, and Frei's decision to work instead on the catalogue raisonne, the board assumed its current roster: Whitney, Printz, New York University professor Robert Rosenblum, and former foundation curator Sally King-Nero. These were the judges who began to gather three times a year, reviewing upwards of 100 submissions each time. These were the ones whose judgments began to roil the art world.

When paintings and prints from Warhol's well-known series were denied-the Flower series, for example-one could assume the board thought them fakes. But dealers began to believe that if they submitted several from the same series at once-seemingly from the same source-a certain percentage appeared to get turned down as a matter of course.

"I bought 14 Warhols from a major wholesaler," recounts one dealer. "These were 70s silkscreens. I bought and paid for them without written agreement because the works were not only purchased from the Andy Warhol estate but stamped with the Andy Warhol stamp-a circle-and with serial numbers from the estate. I submitted five to the authentication board. Four of the five got an A. But the fifth got a B.

Some dealers felt the board was cutting down on outside stock on general principles: the less stock out there, the higher the value of what the foundation still owned. Others worried that the board was making decisions based on quality. "Let's say you have two Marilyns, and one is in better condition," hypothesizes one dealer. "So they'll say, 'We'll authenticate this one, but not that one.' But that's not their position to take."

Dealers became accustomed to having the board deny paintings from well-known series that Fremont, or Hughes, or both, had authenticated on behalf of the estate in the late 1980s or early 1990s. The Karp double-panel self-portrait was a perfect example. In cases like this, dealers wondered if the board had new information, or was quietly correcting misjudgments made by Fremont and Hughes. But how to explain when the board reversed its own rulings, going from A to B-within months?

One dealer submitted two silkscreened paintings to the board and had both approved. "Three months later I sold the first painting for about $300,000. After a few months I consigned the second to Christie's." To the dealer's mystification, Christie's kept the painting awhile, then returned it without explanation. "Then I consigned it to Sotheby's. After 15 days, they said they didn't want to deal with it. It turned out that the authentication board had faxed both Christie's and Sotheby's to say the painting was a fake ... less than a year after they gave it an A rating."

One dealer passed on to Vanity Fair a letter written by the board's lawyer, Ronald Spencer, to a New York gallery owner. In the letter, Spencer called attention to a work being exhibited in a show of Warhol paintings and drawings. Spencer acknowledged that the board had given that work an A, but then informed the gallery owner, "A little more than thirteen months thereafter ... the authentication board wrote the [painting's] owner to advise that the authentication board's opinion had changed by reason of circumstances coming to its attention." Now the work was "not by Andy Warhol," Spencer advised, and its A should be immediately changed to a B.

One well-known New York dealer recounts getting an unsolicited letter recently from the authentication board about a Warhol painting the dealer had bought in the 1980s and kept in her personal collection. The letter advised that the painting had been overlooked in the first volume of the catalogue raisonne. "However, if I wanted to resubmit, I was welcome to do that," the dealer recounts. "The next thing I knew, the painting was stamped denied on top of Fred Hughes's authentication!

"The value isn't the point," says the outraged dealer. "The point is that I made a purchase based on the green light that Fred gave me. Fred was the only person at that point who could authenticate it. Sixteen years later, to be told that it's a fake- it's just not acceptable. I want them to be deposed, but more than that, I can't say. I'll leave it to my lawyer."

In the gossipy world of art dealers, no one heard of such rude surprises happening to the long-established inner circle of major Warhol dealers-Larry Gagosian (with galleries in New York, Los Angeles and London), Zurich's Bruno Bischofberger, et al. (In Gagosian's case, that's because, as a gallery spokesperson says, Gagosian didn't feel the need to submit paintings with a clear provenance for review. Bischofberger could not be reached for comment.) And so charges of favoritism arose, charges which one dealer outside the circle decided to put to the test. He bought a Flower painting in Italy, he says, and paid $120,000 for it-"today it would be worth $500,000"-on the condition that the board approve it. He brought it back to New York and submitted it; it was returned with a B rating. So the dealer showed the painting to a more powerful dealer in New York, one who has frequent dealings with the estate. The second dealer agreed it was real, and offered to become a half-owner of it for $60,000. The painting was then submitted under the second dealer's name.

It came back an A.

Irving Blum, the dealer whose erstwhile Ferus gallery staged a seminal Warhol show in 1963, believes that who submits a painting definitely affects what the board will say. "My sense is that if it's a charmed member of the inner circle they're inclined to accept it. And if it comes from another source they're inclined not to. It's arbitrary, I believe."

One well-known collector with longtime ties to Warhol says, "I think the thing is deeply sinister. It's not that they're uninformed. It has to do with manipulating an art market: by denying any and every Warhol they can, they only increase the value of what they've got."

Fremont, for one, rolls his eyes at this theory. "The authentication board does not have any art to sell," he says. "It is a separate animal from the foundation. And the foundation's running out of work. So that's not a factor."

By intent or not, says one aggrieved dealer, the board's penchant for changing its mind about works submitted by outsiders has another, subtler effect on the market. "A major museum will probably choose not to buy from an outside dealer because the authentication board may change its rating on an artwork from A to B," the dealer observes. "Whereas if it buys from the estate, that's a guarantee." The same guarantee, he suspects, comes with paintings sold by the inner circle of dealers.

As he kept up his lonely campaign, Joe Simon heard stories like these. They only made him more determined. The board's assistant secretary, Claudia Defendi, had offered him one of the well-lawyered lines she says to all owners when they've been denied: "You're welcome to resubmit your work with more documentation." Later, she would draw a blank when asked to come up with the name of just one owner-one owner in the board's eight-year history-who had, in fact, submitted more documentation and had his B rating changed to an A. (Actually, V.F. came up with one: Billy Name, the Factory photographer.) But Simon took her words to heart.

Fremont had been encouraging, too. "He invited me to lunch," Simon recalls. "He advised me to try to trace the history of the piece. I never realized that he knew everything about the painting." In fact, Fremont had participated in the estate's authentication of the Ekstract self-portrait, back in the late 1980s. "It didn't even come to my mind," Fremont says now with exasperation. "Anyway, I authenticated it with a qualifier. At that point in time, since we didn't have a lot of information when Ekstract brought it to the estate ... a letter was attached to the effect that there might be a need to revisit the situation."

Simon collected dozens of affidavits from anyone remotely relevant. He got transcripts of Warhol himself discussing the making of the painting. The transcript was provided by Matt Wrbican, an archivist at the Andy Warhol Museum in Pittsburgh. Both Wrbican and Tom Sokolowski, the museum's director, were sympathetic to his plight, even though the museum has received grants from the foundation that also funds the board.

All this, along with the painting itself, was tendered to the board for its next review meeting. One day in late February 2003, Simon's mobile phone rang. It was Paul Morrissey, one of the many affidavit writers. Morrissey had just spoken to Fremont, who remains a consultant to the board, though not a voting member.

The painting had been denied again.

Once more, the board refused to explain its decision. And when approached by Vanity Fair, none of the board members chose to speak for himself. After some hesitation, however, Claudia Defendi consented to an interview at the red-brick building on West 20th Street; Ronald Spencer, the board's lawyer, would also be in attendance.

Wherever the tens of millions of dollars earned by the estate on the sale of Warhol art over the last 16 years has gone, it certainly hasn't produced any luxuries visible on the ground floor of 525 West 20th Street. When Spencer and Defendi usher a guest in-to a tiny office with three tiny chairs around a tiny white table, the effect is rather like pulling open the Wizard of Oz's curtain.

Usually, one would prefer that a lawyer not be present at an interview. Defendi, however, seems almost incapable of saying anything other than her standard lines. "The board is more than happy to re-review a work if the owner is unhappy and feels the judgment is unfair," she says. Asked on what basis the board authenticates work, she says, "The board authenticates work if it's authentic."

Spencer, a dapper veteran of art-world law, is at least more voluble. "All works that are 'not by Warhol' are not all fakes," he clarifies. "That is to say, a fake is a work created with an intent to deceive. Historically, you have all kinds of work that were not created by the artist but were not created to deceive. They might have been copies; they might have been misattributions." Just as likely, the board might see works Warhol did create-but not as art. "It has to do with the intent of the artist," Spencer explains. "If the artist intends to create art, that's one thing. If the artist intended to sign a baseball cap to give someone his signature, that's not art."

and he then directed someone else to prepare a silkscreen, and he then supervised the process of production and in effect signed off on it, whether or not he signed his name to it, as long as he said, 'That's good, that's what I wanted,' Warhol created that work," Spencer says, "no matter whether there were three, four, or five assistants working under his direction."

The Ekstract and Simon self-portraits would seem to fall squarely within that definition. But Spencer says no. "Ekstract's story, if I understand you correctly, is that in return for giving him the acetates, Ekstract was going to have produced a certain number of silkscreened paintings-six or seven," Spencer says. "Why not 156 or 157? Did you ask him that? I suggest you do. Who said six or seven? Did Warhol say that to Ekstract? Is that Ekstract's story?"

Ekstract has heard this from the board before. "I said, 'These are the people you can trace; these are the people who were connected with this event, who I felt should have them because of their contribution,'" he recalls telling the board. None of them got rich making counterfeit Warhols, he adds, including himself. "I'm a real person, I publish magazines! I have my own money! Whatever success I've had has been by being creative and doing good work, not scamming anybody."

The double-panel Karp self-portrait would also seem to meet Spencer's definition of what constitutes a Warhol work. But again the lawyer disagrees. "Did you ever see the film?" he asks, in reference to a film apparently made of Warhol's visit to the Michigan art class where the silkscreen was made. "Ask Karp about that. I think you'll find that he can't come up with this famous film. And that nobody will be able to."

"I never heard of such a film before," Karp replies in astonishment. "I don't know what he's talking about. In any event, why would one have to come up with a film to justify the work of art anyway? Remember, the work was signed-and they don't deny the signature." ("The board would not say whether the signature was authentic or not," Spencer replies.)

Spencer is unflappable even when shown the letter he wrote relating the board's reversal of judgment over a period of 13 months. "New information came to the board's attention," he says with a shrug. "The legal waiver specifically allows for that kind of change. Art-historical research is an ongoing river of information. Pieces fall into that river and get taken up by the art-historical community even if it's only 13 months."

As for the story of the dealer who resubmitted a denied work under a more powerful dealer's name, Spencer says, "The idea that the board would change its opinion because the owner was an important dealer is so foreign to the way the board operates."

Spencer, like Fremont, debunks the idea that the board denies outsiders' works to enhance the value of the estate's own Warhols. "If one day there are suddenly 100 more Rembrandts on the market, do you think it affects the value of the other Rembrandts? Any art-world expert will tell you it doesn't."

Nor, says Defendi, is the board acting in an arbitrary fashion when it authenticates certain paintings of a series and denies other seemingly identical ones. "It seems arbitrary," she says, "but you have to realize that the board examines every work of art individually." And the dealers who feel the board is denying genuine Warhols because it questions their quality are simply wrong, she asserts. "The board is not concerned with quality," she says, "only that a work is authentic."

How much simpler, by comparison, the Alexander Calder foundation's authentication board seems! Sandy Rower, director and, as it happens, Calder's grandson, says his own lawyer advised drawing up a stern contract for applicants. "For many months we labored over language and wording. Then I realized: this is stupid. So we do not ask anyone to sign any contract of any kind.... I prefer to have an open process where no one is intimidated."

Rower takes a broad view of what constitutes Calder's art. "My grandfather made a lot of unusual things in unusual ways," he says. "He'd make things for people after dinner. We don't think of those works as any less authentic than mobiles." When he does have to deny a work, Rower says, "we always explain why a work isn't a Calder. A letter from me describes in relatively broad terms why a work isn't genuine, including research into our archives and records. If necessary, I'll even go into great detail."

"Sandy is entitled to conduct his foundation as he wishes," Spencer replies. "But the first time he gets a

A signed baseball cap, as Spencer suggests, is not art. Or is it?

Warhol, after all, was an artist whose work always posed the question: What is art? Or conversely: What is not art? Toward the end of his life, Warhol even began putting seemingly random objects into boxes and calling them time capsules: those capsules are now on display as art at the Warhol museum. If he signed a baseball cap, who's to say he wasn't making a work of art with a typically wry, Warholian comment on art and celebrity?

"If you bring a napkin in that Andy signed for you, it's a souvenir," Vincent Fremont says. "There may be value in it, but the board will not authenticate souvenirs." And yet, he admits, "if it's a drawing-for instance, Halston and others had drawings that Andy drew on menus and stuff-that would be different." That would be art? Fremont hesitates. "Yeah. In my opinion. But I don't speak for the board."

It's in trying to draw this line, between art and non-art, that the Warhol authentication board seems to get hopelessly-absurdly-bollixed up.

Take the issue of printers' proofs, made by the printer to determine color, etc., before an actual print run. Sometimes Warhol would give extra proofs of a silkscreened work to the printer as payment, or partial payment, for producing a set of prints for sale or exhibition. Art or non-art? Fremont observes that all printers' proofs must be signed and numbered and marked "P/P." Then, he says, they're legitimate art. One Warhol printer recently submitted about 10 to the board. "They were all printers' proofs," he declares, but none were signed. "I wish I'd had the balls at the time I got them, and asked Andy to sign them." The board's response was ambivalent. "Half of them the board said 'yes' to," the printer recounts. "On one they had no opinion [a C]. And the others are B."

The same printer also has "overage." "If I need 300 good pieces, I will print 400," he explains, "because you always have a problem. The majority of them are destroyed because they obviously have flaws. Some would go to Andy. The boy du jour at the Factory might get one." Art or non-art? One would guess the latter. But, the printer charges, "the foundation is selling this overage! To dealers. You have to buy a block of $100,000."

Fremont says flatly that the foundation is selling no such overage-unnumbered prints from a limited edition. What it has sold are portfolios of unique trial proofs. "Andy would have 15 versions, say, made of one image, to see which colors he wanted to use. The 14 he didn't choose aren't any less good; so [dealer] Ronald Feldman made portfolios of those."

Another former printer, Horst Weber von Beeren, ran off scores of these unique trial proofs in helping Warhol decide which final version of a portrait to go with on private commissions. "Andy should have destroyed the extra prints," he says. "He couldn't and wouldn't. He was a hoarder." Weber von Beeren has no quarrel with the foundation selling its own trove of thousands of such prints. He just wishes the authentication board would authenticate his own. In the fall of 2000, he submitted five of his eight Liza Minnelli proofs. "And they were authenticated! So I sold them to an Italian art dealer. Then we submitted the last three; they were not authenticated." At the same time, the board reversed itself on the first five Minnellis.

Then there's the case of the "Rauschenberg blouse."

Occasionally in the 1960s, Warhol designed one-of-a-kind clothes with images from his paintings. The "Brillo dress" was made of paper. In February 2002, it sold at Christie's for $56,400, after getting an A from the authentication board. From the same dealer who put the "Brillo dress" up for auction, Los Angeles collector Andrew Dodge bought the "Rauschenberg blouse," a one-of-a-kind garment silkscreened with Warhol's image of artist Robert Rauschenberg and his family. The blouse had been on exhibit at the Warhol museum for about three months as part of a show called "The Warhol Look: Glamour Style Fashion." It was identified in that show by the museum's curators as made by Warhol. Still, when Dodge decided to put the blouse up for auction, Christie's took the precaution of submitting it to the authentication board.

The board denied it.

Stunned, Dodge started researching the blouse, as Joe Simon had done with his self-portrait. He

who helped Warhol edit the movie Sleep. Dalton wrote Dodge a letter recounting that she was 16 years old on the one night she wore the blouse, to a John Cage concert, and that she remembered meeting Rauschenberg there. She wore the blouse only once, she said, because it was intended to be a work of art.

"I challenged the board," Dodge recalls, "and they said, 'The object you submitted is "associated" with the artist, but it is not "made by him."' I said, 'What do you mean "not made by him"?' He didn't [silk] screen his own work!" ("If the board used that word ['associated']," says Spencer, "it's not the [same] meaning that Dodge put on it.") Now, as Dodge observes, the blouse is "a dead duck," with no value either to another collector or to a museum.

Just as confusing was the board's treatment of the so-called dollar-bill painting. On the night of April 21, 1986, as Warhol recounted in his published diary, a birthday dinner was to be held at Manhattan's Odeon restaurant for Sam Bolton, a handsome young man from a wealthy family who'd drifted into the Factory and become the artist's latest crush. "I had to be creative to think of birthday presents for Sam," Warhol recounts. "I stuck money in that grandmother-type birthday card, and I did a canvas that had dollars pasted onto it."

Paige Powell, Warhol's closest female friend at the time, accompanied him that evening. "I was there when Andy made it," she says of the artwork. "He pasted dollar bills to a blank canvas and signed it. That was it. It was the kind of thing Andy would do. He made a lot of presents for people."

Some years after Warhol's death, Bolton decided to sell the work. Bizarrely enough, he sold it to ... Joe Simon. Simon submitted the dollar-bill painting to the authentication board.

The board denied it.

Again, in the absence of any explanation, Simon gathered affidavits and other evidence to prove the painting real. Again, the board denied it. Finally, in response to Simon's pleas, the board broke its own policy and issued a reason: the dollar bills bore the signature of Secretary of the Treasury Nicholas F. Brady, who took office in September 1988, well after the painting was made. In this instance, the board members had not denied the painting because they deemed it ephemera. The artwork raised more questions. Its creation was beyond dispute. Had someone doctored it, then, after it was made? "I know I didn't do anything to it," Bolton declares, "and I know Joe didn't." The board's letter also raises a uniquely Warholian question. If someone removed the original dollar bills from the painting, spent them, and later replaced them with others, would Warhol have deemed it any less a work by Andy Warhol?

With the dollar-bill painting, at least, the board has made a decision based on the work's seeming inauthenticity, not on its status as ephemera. But how to explain the Polaroids?

In recent years, hundreds of Polaroid pictures have been finding their way from the Warhol foundation to Bischofberger and other dealers. These are Polaroids Warhol took of the rich and famous whose portraits he did on commission, to great profit, beginning in the early 1970s. The Polaroids were used the same way they are in fashion shoots, as rough, preliminary takes. Warhol would use the images on them to produce his silkscreens, but the Polaroids themselves were just a means to an end.

"We used to throw those Polaroids in the garbage," Bolton recalls. Yet now dealers are hawking them for thousands of dollars each. The subject of one Polaroid, Bolton relates, is a well-known artist. "They are now selling Polaroids that I took of Andy with the artist, and a European dealer is selling them-to the artist! It's insane!"

Timothy Hunt, the Warhol foundation's exclusive agent for Warhol photos and prints, sees no problem with that. "If Andy hands his camera off to someone else and instructs them to take a photograph, then we still consider that a Warhol photograph," he says. "It's Warhol as director." Hunt says the fact that Warhol kept so many of them suggests he valued them. "I suspect if Andy had caught Sam throwing Polaroids into the garbage can, he would have gone berserk." That Christie's in the early 1990s appraised the Polaroids at 50 cents to a dollar each is immaterial. "The market clearly doesn't agree with their appraisal," Hunt says. "They are selling"-for prices ranging up to $20,000 per Polaroid.

The Polaroids are sold directly by the estate and foundation, which stamps them. So they aren't actually considered by the authentication board-unless a buyer wants to resell them. Can a buyer assume the

expect the board to authenticate it."

Last winter, Joe Simon and Richard Ekstract submitted their self-portraits for a final time to the Warhol authentication board. The board was due to meet again on June 9. Ever dogged, Simon had even more documentation to show, collected now in a three-ring binder with multicolored, numbered tabs: affidavits, sales receipts, dealer letters, and the like.

With their works still on the pile at West 20th Street waiting to be reviewed, both Ekstract and Simon received curt letters from the board. Once again, their works had been denied.

As a sort of thank-you to the Warhol museum for its support during his odyssey, Simon recently agreed to let designer Philip Treacy-a good friend-create a handbag imprinted with the Warhol self-portrait the board had just denied. Simon wanted a royalty from sales to go to the museum. The Warhol foundation, however, informed Treacy that it owns the copyright to the iconic image. So it, not the museum, will get the handbag royalties.

"Someone has to be wrong here," Ekstract says one radiant June morning in the semicircular living room of his art-filled Sagaponack home. "It's either me or them. You can't be in the middle someplace."

As far as he and his lawyer can see, Ekstract adds, the board's rejection amounts to a charge of forgery, which is defamation of character. And so he and Simon are seriously contemplating legal action. "These people don't know who to pick a fight with," he says. "We will sue."

"At the very least," says Simon, "we want to stop this madness from happening to all the other owners of Warhol art. Someone has to say to this board: Enough."